Charles Allen BRANDT et al.,
Appellants,

v.

UNIROYAL, INC., Appellee.

No. 79–1221.

District of Columbia Court of Appeals.

Argued Oct. 2, 1980.

Decided Dec. 8, 1980.

Alan M. Perlman, Silver Spring, Md., for appellants.

Curtis E. Von Kann, Washington, D. C., for appellee.

Before NEWMAN, Chief Judge, and KERN and PRYOR, Associate Judges.

PRYOR, Associate Judge:

In June 1973, Charles Allen Brandt, an employee of Stidham Tire Company, received severe injuries when a tire manufactured by appellee, Uniroyal, Inc., exploded as he was attempting to mount it on a customer's wheel rim. Almost three years later, in 1976, Mr. Brandt and his wife, as well as Stidham's workmen's compensation carrier, Liberty Mutual Insurance Company, jointly filed suit against Uniroyal. In multiple counts, Brandt alleged: negligence, strict liability, breach of express and implied warranties, fraud and deceit. Mrs. Brandt claimed a loss of consortium, and Liberty Mutual asserted a subrogation claim based upon its workmen's compensation payments to Mr. Brandt.

Although Liberty Mutual voluntarily dismissed its claim, appellants proceeded to trial before a jury. At the close of the evidence the court directed a verdict for appellee as to the counts of the complaint alleging fraud, deceit, and a breach of express and implied warranties of fitness for a particular purpose. The remaining counts were submitted to the jury. After lengthy deliberations, the jury returned its verdict in favor of appellee and judgment was entered accordingly. This appeal followed after denial of appellants' motion for a new trial.

While appellants have presented numerous questions for our review, we need not address each of these contentions since we conclude that a new trial is required as a result of substantial use by appellee, over objection, of hearsay expert opinion bearing upon a critical area of inquiry in the case.

We therefore reverse and remand for a new trial.

I

The crux of the controversy at trial was the defectiveness *vel non* of the Uniroyal tire which exploded. Appellants' theory of the case was that the tire exploded due to a manufacturing defect, namely, a "kink" in the "bead" (one of two parallel circumferential strands of wire designed to hold the tire to the rim). In defense, appellee asserted that the explosion was caused by improper mounting procedures, specifically, that Charles Brandt overinflated the tire.

*Prior to Liberty Mutual's withdrawal* from this case, it retained a tire consultant, Donald Colver, to examine the tire in question. Mr. Colver examined and X-rayed the tire, and reported his conclusion that the tire was not defective. At trial, Loren J. Forney, a tire and wheel expert retained by appellants, testified on direct examination that he examined the tire and found that the explosion was caused by a manufacturing defect. On cross-examination, counsel probed Mr. Forney about his reliance on the Colver report in arriving at his conclusion. Forney responded that he had been shown a copy of the report prior to having his deposition taken, but that he neither recognized Colver as a bead expert nor relied on his report in reaching his conclusion that the tire was defective. Mr. Colver was not called as a witness at trial. Notwithstanding appellants' objections, the following cross-examination of the witness was permitted:

Q. Now, sir, the report that you have in front of you indicates first of all, it is dated, isn't it?

A. December 16, 1974.

Q. Now, on December 16, 1974, that was approximately six months after the accident, wasn't it?

A. I believe so—yes, sir.

Q. And it was approximately two and a half years before you saw this tire, true?

A. Yes, I believe that is so.

Q. So, sir, Mr. Colver's report at least indicates that he saw this tire much closer in time to the accident than you did, true?

A. That is true.

Q. And Mr. Colver's report indicated that he X-rayed the tire; true?

A. Yes, sir.

Q. The second paragraph indicates, "You will find attached six X-ray negatives of the bead area of each side of the tire;" true?

A. Right.

Q. So, the report that you got a year and a half ago told you that Mr. Colver had examined—had X-rayed each of these two beads both sides six months after the accident; true?

A. If that is what—if that is when he X-rayed the tire—yes sir.

Q. Well, sometime prior to December the sixteenth 1974; true?

A. Yes, sir.

Q. Now, Mr. Colver's report indicates; does it not, that each bead bundle is compact and tight around the entire circumference;

At this point appellants' counsel renewed his objection to this use of the Colver report. The Court, however, allowed counsel for Uniroyal to continue. After asking Forney a number of additional questions about his familiarity with the Colver report, the following transpired:

Q. Let me ask you about the sentence that I just read. Did it make any difference to you at all in arriving at your conclusion that a person who you had worked with in tire cases and looked at the tire six months after the accident said that each bead bundle is compact and tight around the entire circumference; did that make any difference, sir?

A. None whatsoever, I just worked with that man and he told me that he did not know anything about bead cases and we worked together on a case. It was a case in Salisbury, Maryland. He admitted to me that he did not know about it.

THE COURT: Sir, you have answered the question.

BY MR. VON KANN:

Q. Sir, do you think that he was just blowing hot air when he wrote this report? He did not know what he was talking about?

A. I am sure that he just rendered a report.

Q. Without knowing what he was doing?

A. He told me that he didn't know nothing.

Q. So, you dismissed it as a man that was writing a report about a thing that he did not know what he was doing?

A. To rephrase my answer, I seldom take into consideration any other report no matter who may have wrote it, sir.

Q. I see.

A. On my testimony.

Q. All right, sir. Fine. Now, you will note at the beginning of the last paragraph on the first page, a finding by Mr. Colver which I believe that you agree with; do you not? "The wire ends on each side of the break were necked or pulled thin indicating a tensil break." You agree with that; don't you, sir?

A. No, I don't agree with that. I never have.

Q. Now, looking at page two, if you will, sir, of Mr. Colver's report, you will notice in the second paragraph the closing sentence, "It's also my opinion that the bead construction is satisfactory and is sufficiently strong." Do you see that sentence in the report, sir?

A. Yes, sir, I see that.

Q. Did you take any account of that sentence or that opinion by Mr. Colver in arriving at your testimony in this case?

A. I just said that I didn't take any of the report into consideration. I remember reading it on the day of the deposition but that is as far as it went.

Q. Let me ask you just one last question. The first sentence of the next to the last paragraph says, "It is apparent that the bead break was caused by improper mounting procedures." Do you see that, sir?

A. Yes, sir.

Q. Did that conclusion by Mr. Colver six months after the accident have any impact at all in the reasoning that you went through?

A. None whatsoever, sir.

Q. So, you just ignored this report basically?

A. Sure, I never considered anything that this man wrote about that because he had already, as I said, told me that he knew nothing about these bead cases.

■ Uniroyal submits that the use of the Colver report was an accepted mode of determining what consideration appellants' expert gave to the report in reaching his own conclusion. It is true that few would challenge the propriety of allowing an expert to be tested by cross-examination as to the reasons underlying an opinion or conclusion. Such searching inquiry may certainly seek the nature of the data or information which is relied upon. *See* 32 C.J.S. *Evidence* § 560(1) (1964 & Supp.1980). However, in this case counsel went far beyond the permissible scope of inquiry. Forney stated at the outset that although he had been shown a copy of the Colver report prior to having his deposition taken, he did not rely upon it in reaching his contrary conclusion. Nonetheless, counsel was permitted to read from the report and present the adverse findings and conclusions of the out-of-court declarant to the jury. The use of the Colver report in this manner constituted impermissible hearsay.[1] The report was not used to determine the basis of Forney's opinion; the sole purpose for continuing to read from the Colver report was to offer it to the jury for the truth of the matter asserted therein. *See Nemeth v. Ford Motor Company*, 61 Mich.App. 359, 232 N.W.2d 404 (1975), where the court concluded that it was error for the trial court to allow the written hearsay statement of an absent witness to be read into evidence. In reaching its conclusion the court stated:

[T]he cross-examination of an expert witness which explores the basis of his opinion does not legalize hearsay evidence as acceptable for substantive purposes. [*Id.* 232 N.W.2d at 407].

The use of the report in this manner had considerable prejudicial impact upon appellants' case, for Forney was the appellants' sole expert witness on the critical factual question of the defectiveness of the Uniroyal tire. The total effect of the improper hearsay questions was to cast serious doubt on the witness' credibility and conclusions offered by him.

It is recognized that trial judges are afforded broad discretion in determining the scope and extent of cross-examination. *Holt v. United States*, D.C.App., 381 A.2d

---

1. *See Quin v. George Washington Univ.*, D.C. App., 407 A.2d 580, 581 n.2 (1979) where appellant sought to cross-examine expert upon depositions offered by other experts to show difference of opinion and this court stated that the trial court did not err in refusing to allow the same; *Holt v. United States*, D.C.App., 381 A.2d 1388, 1390 (1978) where we held that it was not an abuse of discretion for the trial court to refuse to admit urine tests on cross-examination where the expert testified only to his opinion on direct and did not rely on test results. *See also*, Rogers, *The Law of Expert Testimony* § 64 (3d ed. 1941) at 124–25 where the author comments:

Where a physician did not base his opinion on medical works, cross-examination as to whether he agreed with a medical author was improper unless he had first testified that he had read such author and regarded him as sufficiently authoritative.

*See also, Fleming v. Prince George's County*, 277 Md. 655, 358 A.2d 892 (1976) where the court found that the trial court did not abuse its discretion in refusing to permit cross-examination of a physician using treatises which the physician did not acknowledge as authoritative in the field.

*See also, Ross v. Colorado Nat'l Bank of Denver*, 170 Colo. 436, 463 P.2d 882 (1970) (en banc) where the court stated, "when the cross-examiner ... asked questions and quoted from a treatise ... which the expert witness testified she had not read and therefore, had not used to support her expert opinion, the objections thereto should have been sustained ...." *Id.* 463 P.2d at 886–87. *See also, Lewandowski v. Preferred Risk Mut. Ins. Co.*, 33 Wis.2d 69, 146 N.W.2d 505 (1966), where the court stated it was not error for the trial court to refuse to admit a guide or its contents into evidence where the expert stated that he was familiar with the guide, but had not relied on it in reaching his conclusion. The court stated that to permit the same would have been hearsay. Further, the court iterated: "To allow the use of a scientific or medical work for impeachment purposes, a[n] ... expert must have a familiarity with the book and its contents *and* have based his opinion upon or testified concerning the book." *Id.* 146 N.W.2d at 508 (emphasis supplied, citations omitted).

1388, 1390 (1978). We are likewise cognizant of the basic tenet that expert witnesses may be subjected to rigorous and searching cross-examination. However, this does not include the improper use of hearsay evidence in doing so. *Ross v. Colorado National Bank of Denver*, 170 Colo. 436, 463 P.2d 882, 887 (1970) (en banc).

In *Fox v. United States* D.C.App., 421 A.2d 9 at 12 (1980), this court recently expressed the standard of review for determining whether the erroneous admission of hearsay constitutes reversible error:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry . . . is . . . whether the error *itself had substantial influence.* [*Quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (emphasis added).]

We cannot say with fair assurance that the judgment in this instance was not substantially swayed by the admission of the hearsay testimony.

## II

Prior to closing argument, the court afforded counsel for both sides an opportunity to submit proposed instructions. These were discussed and reviewed by the court. There was no specific request by appellants that the court delineate the separate theories of asserted liability. During the course of the instructions to the jury, appellants' counsel noted at the bench that the charges as to negligence, strict liability, and warranty were being given without making it clear that appellants were asserting separate and alternative grounds of liability. Declining to amend the instructions, the court ruled that it would limit the charge to that which had been submitted and previously agreed upon. A similar request was rejected at the close of all instructions.

During deliberations, the jury, on four occasions, sent communications to the court. Three of the notes indicated the jury was unable to reach a decision. One of the notes requested further instruction with respect to the nature of the questions to be decided. Although a version of the *Winters*[2] charge was given, no further guidance as to the merits of the litigation, was imparted. Ultimately the jury returned its verdict.

■ While we are reluctant to say that the instructions as proposed and given, taken as a whole, were so deficient that they constituted reversible error, nonetheless there is a strong likelihood, when viewed against the backdrop of the previous erroneous evidentiary rulings, that appellants suffered serious prejudice with respect to a clear statement to the jury of the precise questions to be decided as well as the appropriate evidence to be considered in reaching a verdict. Accordingly, the judgment is reversed and the case is remanded for a new trial.

*So ordered.*

2. *Winters v. United States*, D.C.App., 317 A.2d 530 (1974).