ROCK CREEK PLAZA–WOODNER LIM-
ITED PARTNERSHIP and 3636 Wood-
ner Limited Partnership and Jonathan
Woodner Company, Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 82–1346.

District of Columbia Court of Appeals.

Argued May 24, 1983.

Decided Sept. 15, 1983.

Gilbert Hahn, Jr., Washington, D.C., with whom Peter J. Carre, Washington, D.C., was on brief, for appellants.

Richard G. Amato, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and James E. Lemert, Richard L. Aguglia, and Robert J. Harlan, Jr., Asst. Corp. Counsel, Washington, D.C., were on brief, for appellee.

Before KERN, FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

In this appeal from the Tax Division of Superior Court, taxpayers contend that the trial court erred in assessing their property for real property tax purposes at a market value of $10,050,000. The evidence consisted of two appraisal reports—one prepared by taxpayers' expert, the other by the District of Columbia's expert—and testimony by these two experts. The trial court found deficiencies in the report and testimony of taxpayers' expert and thus discredited his appraisal. Concluding that "the only convincing evidence as to value was presented by [the District's] expert," the trial court adopted the District's proffered valuation. We agree with taxpayers' assertions that their expert's report was not defective for the reasons stated by the trial court. Although the trial court may credit one expert over another (or credit neither), we conclude that the trial court may not—as it did here—arbitrarily reject taxpayers' expert evidence. Accordingly, we reverse and remand this case for proper evaluation of the evidence, including due consideration of taxpayers' position.

I.

Taxpayers are two limited partnerships and one corporation having their principal places of business at 3636 16th Street, N.W. They own Lots 831 and 832 in Square 2624 and Lots 352, 353, 354, 358, and 839 in Square 2621, which are improved by the Woodner apartment complex, the Rock Creek Plaza Apartments, and parking lots.

The dispute here is the market value of taxpayers' property for tax year 1979 (July 1, 1978 to June 30, 1979). The relevant date for valuation is January 1, 1978. In February 1978, taxpayers received notices assessing their property at $13,103,140. Taxpayers appealed the assessments to the Board of Equalization and Review, which reduced the total assessment to $9,260,734. Taxpayers paid the assessed tax liability and then appealed the assessments to the Tax Division of Superior Court.

Evidence at trial showed that the property contained 1,119 residential rental units together with commercial space, doctors' offices, and nearly 300 parking spaces. On the valuation date, taxpayers were engaged in converting the portions of their property previously used as hotel units to residential apartments and were rehabilitating the property generally. Because of this conversion and deferred maintenance program, some of taxpayers' units were vacant.

The parties agreed that the "income or economic approach" to value was the most appropriate method for evaluating the fair market value of the property. This method entails deriving a "stabilized annual net income" by reference to the income and expenses of the property over a period of several years. That annual net income is then divided by a capitalization rate—a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on taxpayers' equity in the property, and to pay real estate taxes.

Employing this method, the District's expert determined that the stabilized annual net income figure was $1,257,000 and that the applicable capitalization rate was 12.38%. He subtracted $100,000 from the resulting figure to reflect rent loss during 1978 attributable to the ongoing renovation and found the appropriately rounded market value of the property on January 1, 1978 to be $10,050,000.

Taxpayers' expert estimated the stabilized annual net income to be $929,009. In making his estimate, he assumed all renovation work to be complete. He concluded that the applicable capitalization rate was 10.37% and estimated the market value of the property to be $8,960,781. Because in reality on January 1, 1978 the renovation work was not complete, he subtracted the estimated cost to complete conversion ($850,782) and the estimated rent loss during conversion ($630,855). Taxpayers' expert thus appraised the rounded market value of the property on January 1, 1978 at $7,480,000.

■ The trial court rejected taxpayers' appraisal, adopted the District's appraisal, assessed the property at $10,050,000, and ordered taxpayers to pay the corresponding taxes.[1]

II.

■ In reviewing appeals from the Tax Division of Superior Court, we are bound by the trial court's factual findings, even when based on "substantial and conflicting testimony," unless they are clearly erroneous; if the findings are acceptable, we will not disturb the court's judgment unless it is plainly wrong or without evidence to support it. *District of Columbia v. National*

*Bank of Washington,* 431 A.2d 1, 3 (D.C. App.1981) (citations omitted); *see* D.C.Code § 17–305(a) (1981).

■ In resolving factual issues presented by conflicting expert testimony, the trial court is in the best position to evaluate the experts' qualifications, demeanor, experience, reasoning, and testimony. *Designers of Georgetown v. E.C. Keys & Sons,* 436 A.2d 1280, 1281 (D.C.App.1981) (per curiam). If there are appropriate grounds for disregarding an expert's testimony, the trial court may do so. Indeed, the trial court is free to make its own independent evaluation of the evidence; even when uncontradicted, an expert's testimony is not binding on the court. *Mann v. Robert C. Marshall, Ltd.,* 227 A.2d 769, 771 (D.C.App.1967); *Urciolo v. Sachs,* 62 A.2d 308, 309 (D.C.Mun.App.1948). Thus, as a general proposition, when faced with conflicting expert testimony, the trial court may credit one expert over the other or even disregard both in rendering its judgment.

■ Nonetheless, an expert's testimony may not "arbitrarily be disregarded, disbelieved or rejected." *Medical Service of the District of Columbia v. Llewellyn,* 208 A.2d 734, 736 (D.C.App.1965); *accord Cullers v. Commissioner,* 237 F.2d 611, 616 (8th Cir. 1956); *Estate of Fitts v. Commissioner,* 237 F.2d 729, 732 (8th Cir.1956). When the trial court rejects the testimony of taxpayers' expert, there must be some basis in the record to support the conclusion "that the evidence of the taxpayers' witnesses is unworthy of belief." *Cullers, supra,* 237 F.2d at 616.

---

1. Contrary to taxpayers' assertion, the trial court had authority to increase the assessment above the $9,260,734 assessed by the Board of Equalization and Review. When a taxpayer appeals to the Superior Court, the case is subject to de novo evaluation. D.C.Code § 47–3303 (1981) (recodifying § 47–2403 (1973)) ("The Court may affirm, cancel, reduce, or increase the assessment"). "[O]nce the trial court has acquired jurisdiction over a particu-

lar valuation . . ., that forum not only has the authority but also is obligated to 'grant the relief to which the party in whose favor the judgment is rendered is entitled, even if the party has not demanded such relief in his pleadings'[;] . . . 'the whole case, both facts and law, is open for consideration.'" *District of Columbia v. Burlington Apt. House Co.,* 375 A.2d 1052, 1057 (D.C.App.1977) (en banc) (citations omitted).

## III.

■ In this case, we conclude that the trial court arbitrarily rejected the taxpayers' expert testimony. Therefore, even though the District's expert may have estimated a market value supported by the record, the trial court's arbitrary rejection of the taxpayers' expert prevented the court from making an informed judgment based on due consideration of the parties' positions.

The trial court concluded that "[t]he only convincing evidence as to the value of subject property for T[ax] Y[ear] 1979 was that evidence offered by" the District. The court arrived at that conclusion because, according to Finding 23, taxpayers' expert appraisal deserved "little weight for the reasons stated in paragraph 22 herein." In at least two respects, the trial court clearly erred in faulting the taxpayers' expert.

### A.

In Finding 22, the trial court stated that taxpayers' "expert has ignored certain economic realities in existence in this case, to wit, the existence of an FHA guaranteed mortgage on Lots 831 and 832 obtained six months before the valuation date of $9,750,-000." Additionally, in accepting the testimony and written report of the District's expert, the trial court noted in Finding 24 "that the above-mentioned FHA guaranteed mortgage supports this value."

■ Taxpayers argue that the trial court was incorrect in relying, in any respect, on the value of a mortgage in assessing the value of real property. We disagree with that broad assertion, but we find merit in taxpayers' argument that the trial court

impermissibly relied on hearsay evidence of the FHA mortgage here.

In the first place, contrary to taxpayers' position, the statute does authorize the government to "take into account any factor which might have a bearing on the market value of the real property including, but not limited to ... [the] mortgage ...." D.C.Code § 47–820(a) (1981).[2] Even in cases rejecting a tax valuation based substantially on the value of a mortgage, the courts were concerned only about the weight given the evidence of the mortgage, not about reference to the mortgage as such. *E.g., River House Co. v. Assessor,* 56 A.D.2d 980, 980, 393 N.Y.S.2d 125, 126 (1977) (mortgage "was entitled to be considered [but] was not entitled to great weight"; uncertainty behind reasons for value of mortgage may detract from its evidentiary value and accordingly "limited consideration" of mortgage may be proper); *accord Rock-Time, Inc. v. Finance Administrator,* 75 A.D.2d 526, 527, 426 N.Y.S.2d 773, 774 (1980) ("the amount of any mortgage loan is also of assistance in fixing assessments"); *Elmhurst Towers, Inc. v. Tax Commission,* 34 A.D.2d 570, 571, 309 N.Y. S.2d 680, 683 (1970) (fair and reasonable basis for fixing assessment is derived from "taking all factors into consideration, i.e. ... size of the mortgage loan ..."); *see also Uniroyal, Inc. v. Middlebury Board of Tax Review,* 174 Conn. 380, 390, 389 A.2d 734, 738 (1978) ("in determining value, the trier is under a legal compulsion to consider everything that might legitimately affect value").

Obviously, the value of a mortgage can affect the price at which a willing buyer would purchase property from a willing seller.[3] Moreover, a mortgage typically re-

---

**2.** This section recodified a substantially similar provision appearing in the 1973 Code—§ 47–641 (Supp. V 1978).

**3.** *See* D.C.Code § 47–820(a) (1981) (recodifying *id.,* § 47–641 (Supp. V 1978)) ("The assessed value for all real property shall be the estimated market value of such property") and *id.,* § 47–802(4) (1981) (recodifying *id.,* § 47–622(4) (Supp. V 1978)):

(4) The term "estimated market value" means 100 per centum of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in

flects a lender's assessment that the property presently is worth at least the amount of the mortgage loan. In this case, however, taxpayers argue that, unlike a typical mortgage, the FHA mortgage reflects more than the present value of the property, *i.e.,* it reflects the future value of the property after the improvements (for which the loan was made) are completed. *See* 12 U.S.C. § 1713(c)(2) (1976).[4] Even so, that mortgage could be relevant if properly factored into the valuation analysis. If other evidence tends to show the present value of the property, as well as the value of the proposed improvements, the FHA mortgage—reflecting present and future value—may be probative in assessing the present market value of the property.

What troubles us, therefore, is not that the trial court considered the FHA mortgage in rendering its judgment. The problem, rather, is an insufficient evidentiary basis for the trial court to credit the FHA valuation for any purpose. There is no evidence in the record of the FHA appraisal or mortgage. Nonetheless, counsel for the District represented to the trial court that an FHA appraisal of $12,000,000 existed on the property, and the District's expert testified as to the value of the FHA appraisal. Repeatedly, the District's counsel and its expert referred to the method of the FHA appraisal, to the value of the appraisal, and to the fact that taxpayers' expert had not taken the FHA mortgage into account in his evaluation. The trial court specifically based its rejection of taxpayers' valuation on the fact that their expert had "ignored certain economic realities in this case, to wit, the existence of an FHA guaranteed mortgage ... of $9,750,000."

We do not understand how the trial court found a valid basis for this conclusion. When the District's expert testified, and the District's counsel made representations, as to the value of the FHA appraisal and mortgage, they were referring not to evidence of record but to out-of-court declarants' assertions. Taxpayers, therefore, were not able to cross-examine with respect to the appraisal and mortgage, or even to present arguments that the FHA mortgage was not relevant.

The District argues that the trial court's findings can be supported independently of its reliance on the amount of the FHA mortgage. This may be true, but in finding that the District's representations about the FHA appraisal and mortgage supported its expert's report, the court also rejected the report of the taxpayers' expert because (among other reasons) he had "ignored" the FHA mortgage. We conclude that without record evidence of the FHA appraisal and mortgage, the trial court's rejection of the taxpayers' expert, while crediting the District's expert, was arbitrary.[5]

### B.

The trial court also erred in finding "unsupportable" taxpayers' expert's treatment of the balance of the cost "to complete conversion and deferred maintenance program." The method by which taxpayers' expert appraised the property resulted in a figure ($8,960,781) that represented the value of the property contingent on completion

---

a position to take advantage of the exigencies of the other.

4. "To be eligible for insurance under this section a mortgage on any property or project shall involve a principal obligation in an amount—... [n]ot to exceed 90 per centum of the estimated value of the property or project (when the proposed improvements are completed) ...." *Id.*

5. We previously have reversed where a defendant used a report ostensibly to impeach plaintiffs' expert but actually employed it to convey the truth of the matter asserted in the report to the factfinder. *Brandt v. Uniroyal, Inc.,* 425 A.2d 162, 165 (D.C.App.1980). In *Brandt,* we were persuaded that the use of the report and plaintiffs' inability to cross-examine with respect to it before the jury "had considerable prejudicial impact upon [plaintiffs'] case, for Forney was [plaintiffs'] sole expert witness on the critical factual question.... The total effect of the improper hearsay questions was to cast serious doubt on the [expert's] credibility and conclusions offered by him." *Id.* This case presents an analogous situation.

of the conversion/deferred maintenance program. From that figure the expert then made a "one-time deduction" of $850,782—the amount necessary to "complete the conversion and deferred maintenance program"—in order "to reflect conditions existing as of the effective date of appraisal." Because the taxpayers' expert's figure of $8,960,781 was based on the value of a completely rehabilitated property, and the property on the relevant date for appraisal purposes—January 1, 1978—was not yet renovated, a deduction of the amount necessary to complete rehabilitation was a valid way to ascertain the value on that appraisal date.

The trial court misconstrued the nature of that deduction. It stated that because taxpayers had loan proceeds in escrow adequate (and intended) to satisfy the remaining conversion costs, "a one-time deduction of this amount [is], therefore, unwarranted." Whether or not taxpayer had a source of funds available to complete rehabilitation of the property does not make improper the deduction of the rehabilitation costs from the estimated future (rehabilitated) value, in order to derive the present (unrehabilitated) value. The trial court's clearly erroneous finding that taxpayers' expert's deduction was unwarranted resulted in a perception that taxpayers were deceptive—an incorrect perception that contributed to the trial court's giving "little weight" to taxpayers' appraisal report.[6]

## IV.

Because the trial court premised its rejection of the taxpayers' expert on facts not in evidence and on erroneous reasoning, we must reverse and remand for proper evaluation of the evidence.

*Reversed and Remanded.*

6. We find merit to taxpayers' contention that the District misled the trial court in regard to this escrow fund. Counsel for the District asserted that taxpayers had available to it a fund of $850,782 to spend on the property and that, as such, the amount was "an asset" and should not be deducted from the value. Counsel fur-

---

ther asserted that "a willing purchaser who buys [the property] . . . also buys a safe that is in that building that has $800,000 in it." Even were this assertion supported by the record, we do not perceive its relevance. Property tax is based upon the estimated market value of real property. Cash in a safe is not real property.