David W. PANSING, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1502.

District of Columbia Court of Appeals.

Argued Sept. 27, 1994.

Decided Dec. 29, 1995.

Alan D. Strasser, Washington, DC, for appellant.

Laura A. Cordero, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, and Jennifer M. Anderson, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FERREN and STEADMAN, Associate Judges.

WAGNER, Chief Judge:

Appellant, David W. Pansing, appeals from the imposition of a mandatory minimum sentence of twenty (20) months to five (5) years pursuant to D.C.Code § 33–541(c)(1)(A–3)(ii) (1993) following his conviction of possession with intent to distribute a controlled substance (PWID) (methylenedioxymethamphetamine) (MDMA) (known as "ecstacy") in violation of D.C.Code § 33–541(a)(1).[1] Following a pre-sentencing evidentiary hearing, the trial court found that Pansing did not qualify for sentencing under the addict exception because he failed to prove that he was an addict and that he distributed controlled substances primarily to support his drug addiction. Pansing argues on appeal that the trial court erred in these findings. We conclude that although the trial court erred in finding that Pansing was not an addict, its finding that Pansing's involvement in drug distribution was not for the primary purpose of supporting his addiction is sufficiently supported by the record. Therefore, Pansing does not qualify for sentencing under the addict exception, and we affirm.

## I.

According to evidence adduced at a hearing on Pansing's pretrial motion to suppress evidence, Pansing was arrested in the early morning hours of April 17, 1992, outside the Tracks Night Club after a confidential informant reported to two off-duty police officers, who were working at the club as security officers, that Pansing was selling "ecstacy" inside the club. When the officers confronted Pansing about the complaint, he stated that "[t]he only thing I have on me is some qualude (methaqualude) for my personal use." As Pansing pulled his hand from his pocket, pills spilled onto the ground. At the time of his arrest, Pansing had in his possession sixteen ecstasy pills, three valium pills, and $825 in cash. Pansing told the officers that he had brought $100 or $125 of the money from home. He testified at the hearing that he probably made twenty-five to thirty sales that night. He said that he sold the qualudes for twenty dollars each, and the ecstacy for twenty-five dollars each. Pansing tested positive for cocaine on the day of his arrest.

---

1. Pansing also was convicted in the same proceeding of possession with intent to distribute diazepam (valium), a Schedule IV controlled substance, in violation of D.C.Code § 33–541(a)(1).

The trial court sentenced Pansing to a concurrent term of not less than one year to not more than three years for this offense.

Jerald Halligan, one of Pansing's housemates, testified at the addict exception hearing that he met Pansing at Tufts University and that after graduation in 1991, they moved to the District with two other college friends with whom they shared a house in Mt. Pleasant. Halligan testified that Pansing was an active student, who wrote for the paper and performed well academically. According to Halligan, Pansing began using drugs on the weekends during the fall of 1991 after he became associated with "new friends," who frequented bars and clubs, known as the "club kids." Between 1991 and 1992, according to Halligan, Pansing's drug use escalated, becoming "[a]bsolutely out of control.... [D]rugs became the major factor in his life." He testified that Pansing used ecstasy, cocaine, LSD, and ketamine or special K. Halligan said that he frequently saw Pansing under the influence of drugs, at times to the extent that his eyes rolled back in his head and he could hardly speak or walk without assistance. Prior to December 1991, Halligan and his roommates confronted Pansing about people calling or coming by the house seeking to buy drugs from Pansing, and as a result, Pansing put a stop to it. In the late summer of 1992, Halligan saw a dramatic change in Pansing. He said Pansing stopped using drugs, committed himself to pursuing his education, and formed meaningful friendships again.

Pansing testified that he began using drugs regularly, at least a few times a month, in September 1991. Most often, he used ecstasy and cocaine, but he also used marijuana and LSD. His drug usage increased steadily until he was using cocaine at a minimum of three times a week, and ecstasy, two to three nights a week. He explained that these nights extended until noon the following day. Pansing testified that at the time of his arrest in April 1992, he was using drugs "very heavily," particularly cocaine. He testified that he used cocaine on Thursday through Saturday, and sometimes on Sundays, and he used smaller quantities on Monday, Tuesday or Wednesday. He said he usually purchased two eightballs a week (consisting of about 3.5 grams of cocaine each) at a cost of between $200 and $250 per eightball. Pansing also was using about twenty ecstacy pills a week or at least six pills a night, three nights a week, at a cost of between $15 and $17 per pill, as well as special K, a veterinary tranquilizer. According to Pansing, special K caused disorientation and a loss of touch with reality.

Initially, Pansing purchased drugs with money he saved from graduation gifts. When his savings ran out, his salary was inadequate to cover his drug usage, and he began to sell ecstacy and special K in order to purchase cocaine and ecstacy for his own use. He testified that he would receive a shipment of 200 pills three times a month from a friend in Boston, which usually cost him $17 per pill.[2] Pansing testified that he sold approximately 150 pills from each shipment, used an average of 18–20 pills per week himself, and gave away the rest.

Pansing had an annual salary of $19,000 and a net take-home pay of approximately $1,100 per month. He testified that his monthly living expenses included: rent, $420; utilities, $75 to $100; food, $433;[3] and transportation for work, $80 to $100.

On the day he was arrested, appellant had in his possession sixteen tablets of ecstacy, and three valium pills. Although he had not used cocaine since the Tuesday just preceding his arrest, he tested positive for the drug on the Thursday of his arrest. At the time, he had $850 in cash and $400 worth of drugs which he planned to sell. As a condition of his release in this case, Pansing was ordered not to use drugs. He scheduled his weekly drug test for Thursdays in order to avoid detection of his week-end cocaine use. He had heard that cocaine did not remain in the system after three days; therefore, he thought he could use cocaine on Thursday through Sunday, and drink alcohol and take special K, for which he would not be tested, on the other days. Pansing never tested

---

**2.** If Pansing paid in advance, which he could not, the pills would cost $15 each. When he had to take the pills on consignment, he had to pay $17 for each pill.

**3.** Pansing testified that food cost him about $100 per week. On a monthly basis, this would amount to approximately $433.

positive for drugs after his arrest. Pansing testified that because of his drug use, he missed work frequently, particularly Mondays.[4] Although his job performance evaluations continued to be excellent, his supervisor reprimanded him unofficially about his absences.

Pansing stopped using drugs regularly in August 1992. He testified that he last used cocaine in January 1993. In March 1993, he began treatment for his drug addiction with Dr. Jacob Melamed, a clinical psychologist, on a biweekly basis. Prior to the sentencing hearing, Dr. Melamed submitted a letter to the trial court dated June 21, 1993, in which he stated that Pansing "ha[d] made substantial progress in the ongoing process of recovery from addiction" and that he had an excellent prognosis for rehabilitation. There also was submitted to the court a report of a psychiatric evaluation of Pansing from Dr. Thomas C. Goldman, a psychiatrist. Dr. Goldman concluded that Pansing was an addict. He stated that he developed "typical withdrawal symptoms related particularly to the use of cocaine powder." He reported that Pansing "struggled to limit his use, telling himself he'd take only one, then two, then three hits, but found that in fact he needed more and more drugs to get the same effect." Dr. Goldman expressed the opinion that Pansing was "addicted both pharmacologically and socially/psychologically." However, he also reported that Pansing derived a "sense of power and popularity" within the Club Kids scene because "people would 'kiss your a[--]' to get drugs." It was Dr. Goldman's opinion that Pansing's motive for selling drugs was not profit, but "to maintain the club scene with himself at the center and to keep himself supplied with drugs on which he was becoming increasingly dependent for a sense of social well-being and competence," and that Pansing "sold and distributed drugs mainly to support his own habit and not for outside profit."[5] The government presented no witnesses.

## II.

Pansing argues that the trial court erred in finding him ineligible for sentencing under the addict exception. Under the provisions of D.C.Code § 33–541(c)(2) (1993), the trial court has discretion to waive the mandatory minimum sentence for certain drug offenses, including PWID, for which Pansing was convicted, when that defendant demonstrates that he committed the offense "for the primary purpose of enabling the offender to obtain a narcotic or abusive drug which he required for his personal use because of his addiction." Id. To be eligible for the exception, a defendant must prove that: (1) he was addicted to a narcotic or abusive drug at the time of the offense; (2) he committed the offense for the primary purpose of supporting that addiction; and (3) he had no "disqualifying prior convictions."[6] Pearsall v. United States, 636 A.2d 966, 968 (D.C.), cert. denied, —— U.S. ——, 115 S.Ct. 133, 130 L.Ed.2d 76 (1994); Mozelle v. United States, 612 A.2d 221, 223 (D.C.1992); Gibson v. United States, 602 A.2d 117, 119 (D.C.1992). See also Dupree v. United States, 583 A.2d 1000, 1002 (D.C.1990); Grant v. United States, 509 A.2d 1147, 1151 (D.C.1986). It is the defendant's burden to demonstrate eligibility for the addict exception "so that the exception does not become a 'loophole for drug users who are also sellers.'" Stroman v. United States, 606 A.2d 767, 769 (D.C. 1992) (quoting Brandon v. United States, 553 A.2d 640, 642 (D.C.1989)).

The trial court determined that Pansing was not eligible for sentencing under the addict exception. First, the court rejected the claim that Pansing was an addict because of its view that Pansing could not be addicted to cocaine if he used it only on week-ends. In that connection, the trial court stated the following:

First of all weekend addictions would seem to be a contradiction in terms. If

---

4. His frequent absences on Monday came to be dubbed by his supervisor "Wally Mondays."

5. Dr. Goldman saw Pansing five times for one hour each time, interviewed Mr. Halligan, reviewed a copy of the transcript of the hearing on the motion to suppress and stipulated trial, and

correspondence from Pansing's attorney, as well as materials provided by Pansing's attorney on the legal definition of addiction.

6. There is no dispute that Pansing had no prior disqualifying convictions.

one is addicted to something, one presumably is addicted as much on Wednesday as one is addicted on Sunday and Saturday, because addiction doesn't know what the calendar says. And if addiction does know what the calendar says it doesn't seem like it is an addiction. That's the first issue that this case raises.

The court found that Pansing used a large quantity of drugs on week-ends, but that did not mean that he was addicted. The court explained

> You know, you could be a smoker, and if all you do is smoke your cigarettes on a weekend, nobody is going to say that you're addicted to smoking cigarettes. You're smoking on a weekend because you want to. I don't know very many smokers of cigarettes who only smoke on a weekend.

Essentially for these reasons, the trial court concluded that the legislative definition of addiction was not satisfied in Pansing's case.

Pansing argues that the trial court's factual determination that he was not addicted to cocaine was clearly erroneous. Specifically, he contends that the trial court misconstrued the nature and duration of his addiction and that, without rejecting the credibility of his witnesses and other supporting documentation, erroneously concluded that the evidence of his addiction was insufficient. The government argues that Pansing failed to show habitual use of narcotic drugs which presented a danger to society or which evidenced a loss of self-control. It further contends that Pansing was only a "weekend partier," who was addicted to a lifestyle and who was able to maintain control over his drug use, as manifested by his job performance. Recognizing the deference which this court generally accords the trial court's factual findings,

we conclude nevertheless that the trial court's findings that Pansing was not addicted within the meaning of the addict exception is not supported by the evidence.

■ In determining whether a defendant qualifies for the addict exception, the trial court must determine first whether he was an addict at the time of the commission of the offense. D.C.Code § 33–541(c)(2); *Stroman, supra,* 606 A.2d at 769; *Grant, supra,* 509 A.2d at 1151. The statute defines an "addict" as

> any individual who habitually uses any narcotic drug or abusive drug so as to endanger the public morals, health, safety, or welfare, or who is or has been so far addicted to the use of such narcotic drug or abusive drug as to have lost all power of self-control with reference to his addiction.

D.C.Code § 33–501(26) (1995).[7] We have stated that "the addict requirement would be satisfied if the defendant shows habitual use of narcotic drugs, even if [he or] she cannot prove physical addiction." *Dupree, supra,* 583 A.2d at 1000 (citing *Grant, supra,* 509 A.2d at 1152–53). "[T]he defendant must relate [his] habitual use of drugs to the endangerment of the public or to the loss of self-control with reference to [his] addiction." *Id.* at 1003; *See* D.C.Code § 33–501(24).

■ Contrary to the trial court's determination that the legislative definition of addiction was not satisfied by Pansing's evidence, the evidence, if believed, compels the opposite result. It showed Pansing's pattern of regular cocaine use, which increased steadily between September 1991 and April 1992, when he was arrested. Pansing was using cocaine every week-end, Thursday to Sunday, and sometimes two or three nights a week. He tested positive for cocaine follow-

---

7. An "abusive" drug includes "methamphetamine, its salts, isomers, and salts of its isomers." D.C.Code § 33–501(26)(B). There is ample evidence that Pansing habitually used ecstasy, in addition to cocaine. Assuming that ecstasy is within the category of methamphetamines described in D.C.Code § 33–501(26)(B), a factual issue not developed in the trial court, proof of his addiction to the substance, if an abusive drug, also would meet the requirement of the addict exception. *See* D.C.Code §§ 33–541(c)(2) & –501(26)(B). However, Pansing does not rely on a claimed addiction to ecstasy. He takes the position that the trial court's finding that he was not addicted to ecstasy was legally irrelevant, and the trial court focused on whether Pansing was addicted to cocaine. Under the circumstances and in view of our disposition of the addiction question, we do not address the effect of evidence of Pansing's habitual use of ecstasy in our analysis of whether he proved himself to be an addict within the meaning of the statute.

ing his arrest in the early morning hours on a Thursday, which he attributed to drugs ingested on the prior Tuesday. Halligan recounted seeing Pansing under the influence of drugs frequently, and at times to the point that he could not speak or walk without assistance. He also testified that during this period, "drugs became a major factor" in Pansing's life and that he was using drugs "on a daily basis ... and his entire life was sort of focused around the drugs." Moreover, Dr. Goldman, a psychiatrist, Dr. Melamed, a clinical psychologist, and the presentence report writer reported that Pansing was addicted.

The trial court did not reject the testimony of Pansing and his witness as to Pansing's drug usage and pattern of conduct. It accepted without question that Pansing was a drug user. What the court determined, without any evidentiary or other foundation in the record, was that one could not be addicted to cocaine if he engaged in episodic use of the drug, i.e., on week-ends.[8] Essentially, in assessing Pansing's drug addiction claim, the court relied upon its own personal knowledge or beliefs about the inability of one addicted to cigarettes to be a week-end cigarette smoker in reaching the conclusion that one who uses a large quantity of drugs only on certain days of the week cannot be a drug addict.

■ The trial court must "make [its] determination of a defendant's eligibility under the addict exception on the basis of reliable information and appropriate considerations." *Grant, supra,* 509 A.2d at 1155. It is not appropriate for the trial court to reach beyond the record to consider in its ruling, as the court did here, information which was not before the court and which the defendant had no opportunity to refute. The extent to

which nicotine addiction can be equated with cocaine addiction and other abusive drugs is not the type of factual determination which can be made without some evidence. There is no basis for the inference which the court made. Moreover, in reaching its conclusion, the court apparently rejected the uncontradicted findings of addiction of the psychiatrist and psychologist. The trial court should not reject arbitrarily the uncontradicted experts' opinions unless there is some basis in the record for doing so. *See Prost v. Greene,* 652 A.2d 621, 629 (D.C.1995); *Rock Creek Plaza–Woodner Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983).

■ The government argues that the fact that Pansing never tested positive for cocaine after the night of his arrest and that he claimed to have "just quit" subsequently without undergoing therapy or counseling demonstrate that Pansing was not addicted to cocaine. The trial court did not indicate that it relied upon these facts in reaching its conclusion, nor did the government argue them to the trial court. In any event, the addict exception is not restricted to exclude those who seek to stay drug-free while under a court order to do so. *See Dupree, supra,* 583 A.2d at 1003.[9]

■ The government argues that appellant's claim of addiction is inconsistent with his excellent work performance evaluations. We have held that maintaining employment does not disqualify one for the addict exception. *Dupree, supra,* 583 A.2d at 1003. Here, the evidence showed that Pansing was reprimanded and warned about his frequent absences from work. Additionally, there was evidence that drugs endangered Pansing's health, since he had asthma. He dissipated his financial resources and distributed drugs,

8. According to the Manual of the American Psychiatric Association, DSM–III, at 178, cocaine abuse and dependence occurs in different patterns, episodic and chronic daily, or almost daily use. Episodic cocaine use is described as use of the drug "separated by two or more days of nonuse, e.g., it may be used on weekends and once or twice during the week." *Id.*

9. As Judge Schwelb pointed out in a concurring opinion in *Dupree,* with which the majority indicated that it expressed no disagreement

Even if the negative tests had occurred when Ms. Dupree was not under court order, the statute should not be so construed as to permit them to disqualify her. Well-motivated addicts progress, regress, get off the floor, and try again. To disqualify them from more lenient sentencing because they tried to stay clean would provide a counter-incentive to abstinence, potentially negating all the good advice from those who want them to "kick the habit." 583 A.2d at 1005 n. 2.

which tends to indicate public endangerment. He spent the equivalent of his take-home pay on cocaine and turned to selling drugs. *See id.* at 1004 ("[t]estimony concerning such a pattern of conduct, if believed, would bring one within the definition of an addict ... [whose addiction] endanger[s] 'the public morals, health, safety [and] welfare.'") (quoting D.C.Code § 33–501(24)). For these reasons, we conclude that the trial court's determination that Pansing was not an addict within the meaning of the statute was plainly wrong and without evidentiary support.

## III.

■ However, the trial court also found that Pansing did not meet a second criteria for the exception, *i.e.,* that he sold drugs for the primary purpose of supporting his drug addiction. In that connection, the trial court posed the following question:

> The second issue that this case raises is can a person, who by his own testimony, distributes for free twenty pills a week, which have cost him a minimum of fifteen dollars, or in other words, distribute for free, three hundred dollars of ecstasy per week, weekend, weekout, ... can it be found with regard to such a person that the selling of other pills was caused by the need for funds to supply the weekend addiction[?]

The court found and concluded that

> There is also no question but that he was selling an enormous volume of drugs when compared even to the cases this Court sees on a daily basis in an assignment where the sale of drugs is the main case. This defendant had on him what would have been considered in any other case a substantial amount of money and a substantial amount of drugs....
>
> This defendant had a lot of drugs on him, a lot of money on him and by his own testimony in this hearing was giving away a lot of it.... And you cannot say when

you give away drugs that you are giving them away ... to support your habit for those drugs. There's no way you can say that. And the defendant is not saying that.

. . . . .

> I am finding that in light of ... the testimony concerning the volume of his sales, concerning the drugs he gave away, there is no way that anything called a weekend addiction caused him to commit the crime that he was found guilty of in this case. I therefore, find that he does not qualify for the addict exception in the statute....

There is evidence in the record which supports the trial court's determination that Pansing did not commit the offense for the *primary* purpose of supporting his addiction. *See* D.C.Code § 33–541(c)(2). According to Pansing's testimony, he had a net take-home pay from his employment of approximately $1100 per month.[10] As the trial court found, he gave away to friends a significant amount of drugs, and Pansing's testimony supports that finding. It reveals that he gave to friends pills which cost him about $1200 each month to purchase, as the trial court found.[11] He testified that he sold about 450 of the 600 pills he received each month, and a mathematical calculation of his cost and sales price reveals a profit of about $3600 per month. The trial court found explicitly that Pansing was not addicted to ecstasy, and he does not challenge that ruling.[12] According to his testimony, he spent about $440 to $500 each week-end for cocaine. The trial court also found significant to its ruling that Pansing had a large volume of drugs and money on him on the night of his arrest, as the record shows.

The trial court concluded that Pansing was not selling such an enormous volume of drugs primarily for the purpose of supporting his claimed drug addiction as required by

10. Pansing had monthly living expenses almost equivalent to his net take-home pay.

11. Pansing testified that of the 150 pills he retained from the shipment each month, he used about 18 to 20 pills each week and gave away the

rest so that he would not be the only one using drugs. The 70 odd pills he gave away would cost on consignment about $1190.

12. It is Pansing's position that this ruling is legally irrelevant. See note 6, *supra.*

the statute.[13] Given the deference that is accorded generally to the trial court's factual findings, we cannot say that its findings were not supported by the evidence. *See Pearsall, supra,* 636 A.2d at 968.

For the foregoing reasons, the judgment appealed from hereby is

*affirmed.*[14]

FERREN, Associate Judge, dissenting:

The majority first holds, and I agree, that the trial judge erred in finding that Pansing was not a drug addict. By improperly ignoring expert testimony in making that finding, however, the trial judge erased any credible basis for the finding that underlies the judge's, and the majority's, second ruling: "that Pansing's involvement in drug distribution was not for the primary purpose of supporting his addiction." *Ante* at 1298. A failure to understand addiction in itself creates considerable doubt that the judge can find, comprehendingly, that the defendant's drug sales—unquestionably used substantially to feed the habit—have primarily another purpose. In any event, apparently because the trial judge did not believe Pansing was addicted to cocaine, the judge neglected to provide any analysis of what "primary purpose" means. Furthermore, the judge made no concrete finding as to the quantity of drugs needed, and used for sale, to satisfy Pansing's drug addiction. He thus provided no basis for ascertaining the primary purpose of Pansing's drug sales. This court, in reviewing sentencing discretion, cannot properly do such work for the trial judge. I therefore see no supportable basis for the majority's own finding—from an improper, de novo analysis of the record—that Pansing's drug sales could not have served primarily to support his addiction.

More specifically, the trial judge focused his "primary purpose" analysis on a "weekend addiction" without acknowledging undisputed evidence that, to Pansing, a weekend was four days, Thursday through Sunday—hardly a minor period of the week. The judge then engaged in a rough analysis, generally comparing the drug distribution volume in this case with other "cases this court sees on a daily basis." He did not make any computation to show the costs of drugs, sales prices, and related profits, and thus he provided no basis for assuring this court that Pansing's sales exceeded a level that could be said primarily to have supported his addiction. My colleagues, however, do calculations for the judge. That use of the record is an altogether forbidden exercise in appellate court fact-finding. *See Speyer v. Barry,* 588 A.2d 1147, 1156 (D.C.1991) ("appellate courts are not equipped for fact-finding"); *In re. A.C.,* 573 A.2d 1235, 1242 (D.C.1990) (en banc) ("Sitting as an appellate court, we cannot engage in fact-finding."). Even were that fact-finding permitted, it does not even begin to come to grips with one of Pansing's

---

**13.** Our dissenting colleague questions why, applying the *Prost* rule, as we do in connection with the expert's opinion of Pansing's drug addiction, the trial court should not be required to accept the medical expert's opinion on the subject of Pansing's primary purpose for selling drugs. *See Prost, supra,* 652 A.2d at 629 (trial court should not reject arbitrarily uncontradicted expert's opinion absent record basis for doing so). The answer is apparent upon considering the different subject matter of the two opinions in light of our case law. Addiction of the type involved in this case refers to a condition generally beyond the ken of the average lay person, for which the medical expert's special knowledge and experience would aid the trier of fact. *See Blakeney v. United States,* 653 A.2d 365, 369 (D.C.1995); *Wilkes v. United States,* 631 A.2d 880, 883 n. 7 (D.C.1993), *cert. denied,* — U.S. —, 115 S.Ct. 143, 130 L.Ed.2d 84 (1994) (citations omitted). On the other hand, the primary purpose for which Pansing sold drugs is dependent upon facts and circumstances which require no expert

medical opinion for comprehension. While an expert may give an opinion about ultimate facts, such opinion is not appropriate if it relates "to matters in which the [finder of fact] is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions." *Gant v. United States,* 518 A.2d 103, 110 (D.C.1986) (citation and internal quotation marks omitted); *see also Beach v. United States,* 466 A.2d 862, 864 (D.C.1983). Moreover, the trial court may reject the opinion where, as here, there is a basis in the record to support a contrary conclusion. *See Prost,* 652 A.2d at 629.

**14.** Pansing also argues that the trial court gave no weight to his proposed drug rehabilitation program, for which he contends he is a good candidate. In light of the trial court's finding that he did not meet the eligibility requirement that he engaged in distribution primarily to support his narcotic addiction, it was not necessary for the trial court to consider the plan.

contentions, which the trial judge ignored, that Pansing's sales of the drug "ecstacy" were related to his purchase of cocaine to feed his habit.

Sentencing is a matter of trial court discretion. Unless the trial court has "but one option," this court may not substitute its own judgment for the trial court's erroneous exercise of discretion; rather, we must remand for a proper exercise of discretion based on applicable criteria the trial judge previously ignored. *See Wright v. United States,* 508 A.2d 915, 920 (D.C.1986) (quoting *Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979)). Here, the trial judge erroneously exercised discretion not only in finding that Pansing was not an addict but also in failing to identify and address applicable definitional criteria for "primary purpose," and in failing to present sufficiently detailed, record-based reasons to justify the judge's "primary purpose" ruling. *See Johnson,* 398 A.2d at 365. My colleagues do not say, let alone demonstrate, that the trial judge had "but one option." *Wright,* 508 A.2d at 920; *Johnson,* 398 A.2d at 364. It follows that the majority has erroneously taken over the trial judge's responsibility, violating a basic limitation on the appellate court's review function.

Interestingly, the majority—in ruling that the trial court erred in finding Pansing was not an addict—stresses that "[t]he trial court should not reject arbitrarily the uncontradicted expert's opinion unless there is some basis in the record for doing so." *Ante* at 1302. Then, contrary to its own admonition, the majority implicitly rejects, without saying why,

Dr. Goldman's opinion that Pansing's motive for selling drugs was not profit, but

"to maintain the club scene with himself at the center and to keep himself supplied with drugs on which he was becoming increasingly dependent for a sense of social well-being and competence," *and that Pansing "sold and distributed drugs mainly to support his own habit and not for outside profit."*

*Ante* at 1300 (footnote omitted) (emphasis added). Even more interestingly, the majority ignores this expert testimony without supplying a legal definition of "primary purpose" to be used as a basis for rejecting the doctor's opinion. Obviously, "primary purpose" is a legal, not a medical, phrase. But the term "addiction," as a statutory word, is also ultimately a legal concept which my colleagues are comfortable referring for expert opinion. They state no reason, however, why the expert should not have been acknowledged in the analysis of primary purpose.[1]

I believe the trial judge—by the majority's own words—was obliged to demonstrate, by reference to an acceptable legal definition, why it rejected Dr. Goldman's expert opinion (based on physical and psychological data) that Pansing "sold and distributed drugs mainly to support his own habit." Like the trial judge, however, the majority not only ignores Dr. Goldman's testimony but also eschews any clear articulation of how "primary purpose" should be defined and evaluated. Does it mean more than 50% of one's overall purpose? Or can it mean the most significant one of several purposes though only 25%, for example, of all purposes taken together? The majority does not tell us; it merely defers to the trial judge's standard-

1. In response to this dissent, the majority explains why it ignores Dr. Goldman's expert opinion that Pansing "sold and distributed drugs mainly to support his own habit and not for outside profit." Chief Judge WAGNER writes: "the primary purpose for which Pansing sold drugs is dependent upon facts and circumstances which require no expert medical opinion for comprehension." *Ante* at 1304 n. 13. This reply has two related flaws. First, it ignores the need to define "primary purpose" so that one can understand why an expert opinion would not be relevant. Second, it ignores the fact that in this case psychological factors, requiring expert evaluation, bear on whether this particular defendant

had a need to conduct his business in the way he did to satisfy his particular form of addiction. If the majority agrees, on the basis of expert opinion, that Pansing was a drug addict, then I do not understand why the majority rejects the proposition that the expert who understands that addiction will have some relevant understanding of what is required to satisfy it. I believe the trial court (and this court on appeal) at least should have to consider and reject that expert understanding, as applied to a clearly announced statutory definition, before ruling that Pansing's "primary purpose" in selling cocaine and ecstacy was not to support his addiction.

less conclusion, based on no meaningful findings, "that Pansing was not selling such an enormous volume of drugs primarily for the purpose of supporting his claimed drug addiction as required by the statute." *Ante* at 1304.

I would remand for resentencing without the erroneous, "no addiction" mindset, and would require the judge to make specific (and thus reviewable) findings that demonstrate Pansing's drug sales of cocaine and ecstacy exceeded any reasonable contention that their "primary purpose"—as clearly and persuasively defined—was to support his addiction to cocaine.