**In re Clarence F. STANBACK, Jr., Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 91–BG–1527.**

District of Columbia Court of Appeals.

Argued Jan. 12, 1995.

Decided July 30, 1996.

Elizabeth A. Herman, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for petitioner, the Office of Bar Counsel.

Marion E. Baurley, Washington, for respondent.

Before WAGNER, Chief Judge, STEADMAN and KING, Associate Judges.

KING, Associate Judge:

This matter is before the court on the Report and Recommendation of the Board on Professional Responsibility ("Board") that respondent, Clarence F. Stanback, Jr., be disbarred from the practice of law in the District of Columbia, based on the Board's findings that respondent committed the following violations of the disciplinary rules: failure to preserve the identity of estate funds in an identifiable account; intentional misappropriation; failure to maintain complete records of estate funds coming into his possession; and neglect of a legal matter.[1] The Board also found that respondent violated the Rules of Professional Conduct by: commingling/misappropriating funds and failing to keep complete records; failing to promptly deliver funds and to tender full accounting; failing to protect an estate's interest after termination of representation by promptly surrendering papers or property; failing to represent the client zealously and diligently; and interfering with the administration of justice.[2] Respondent challenges the Board's

---

1. DR 9–103(A); DR 9–103(A)(2); DR 9–103(B)(3); DR 6–101(A)(3) (1991).

2. Rule 1.15(a); Rule 1.15(b); Rule 1.16(d); Rule 1.3(a); Rule 8.4(d) (1991).

findings and recommendation on the grounds that: (1) the hearing committee and Board erred in finding that he failed to establish mitigation pursuant to *In re Kersey*, 520 A.2d 321 (D.C.1987); and (2) two hearing committee members were improperly predisposed to decide against him. We hold that the claim of bias is not supported by the record. We also hold that there is a basis for the Board's findings that respondent failed to prove that he was suffering from an alcohol-induced impairment at the time he misappropriated his clients' funds. Therefore, we adopt the recommendation of the Board and order that respondent be disbarred.

## I.

On December 9, 1992, Bar Counsel charged respondent with the violations set forth above for actions stemming from his representation of Kathleen and Andrew Doig in connection with their duties as personal representatives of the estate of Alice Kelly, who died on September 17, 1986. Most of the facts supporting the charges were stipulated and agreed to by Bar Counsel and respondent. In sum, respondent admitted that he violated the various disciplinary rules, however, he challenged, before the Board, the hearing committee's findings relating to the timing of the misappropriation of his clients' funds [3] and the hearing committee's rejection of the *Kersey* defense. Applying the applicable standard of review, the Board sustained the hearing committee's factual findings with respect to both points. *See In re Micheel*, 610 A.2d 231, 234 (D.C. 1992) ("The Board is obliged to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole.").

Respondent contends that the misappropriation occurred no earlier than March of 1991, a time when it is essentially undisputed that his alcoholism substantially affected his professional conduct. Alternatively he argues, if the misappropriation occurred in late 1990, as the hearing committee found, there

was also evidence to establish that at that time his ability to conduct his professional activities was impaired due to alcoholism. Because the circumstances relating to the misappropriation of funds and respondent's problems with alcohol are the only factual questions in dispute, we will set out the evidence presented on those points in some detail.

### A. Committee's Findings As to Misappropriation

The facts developed before the hearing committee showed that, acting on respondent's advice, Kathleen Doig, in late August of 1990, closed an estate bank account in West Virginia in the amount of $10,979.75. A check for that sum, made payable to respondent, was sent to, and deposited by respondent in a trust account. On August 30, 1990, respondent, acting without either the knowledge or consent of his clients, withdrew $8,000 from the trust account, and deposited that sum in his office operating account. Using both his own and estate funds, he then paid a $15,000 office rent bill with a check drawn on that account. The evidence also established that, upon learning that the Internal Revenue Service had placed a levy on the trust account in late September or October, 1990, respondent withdrew additional funds from the trust account, without authorization from the Doigs, and placed those funds together with some personal funds in a strongbox.

By the end of November 1990, the balance in the trust account had fallen to $5,355.02, and it remained below $10,979.75, the amount belonging to the estate, from December 3, 1990 through the end of January 1991, when the balance again rose above that amount. However, at the end of February 1991, the balance in the trust account again fell below $10,979.75 and thereafter remained below that level. Respondent testified that during that period, he kept estate funds in a strongbox and did not misappropriate them for his own use until March of 1991.

---

**3.** The dates of respondent's misappropriation are material in view of his invocation of the *Kersey* mitigation defense.

Although respondent maintained that the misappropriation did not occur until February or March of 1991, the hearing committee, pointing to respondent's significant indebtedness beginning in the summer of 1990; his admitted commingling of funds in October of 1990; his use of the commingled funds for non-estate purposes immediately thereafter; and the absence of any record-keeping with respect to estate funds, rejected that claim and found that misappropriation occurred soon after the estate funds were transferred to respondent's operating account in late 1990. In short, the committee ruled that there was clear and convincing evidence of intentional misappropriation of the clients' funds in the fall of 1990, which, in the absence of legally recognized mitigation, mandated disbarment pursuant to *In re Addams,* 579 A.2d 190, 193 (D.C.1990) (en banc).

## B. Committee's Findings On the *Kersey* Defense

Although respondent concedes that he intentionally misappropriated client funds (while disputing when the misappropriation actually occurred) and that mandatory disbarment would ordinarily flow from such conduct, he contends that pursuant to *Kersey,* he should not be disbarred because his misconduct was caused by clinical depression and excessive alcohol consumption. There was no serious dispute that respondent suffered from an alcoholism-induced impairment that substantially affected his professional conduct from approximately March 1991 onward. Had the misappropriation occurred then, a *Kersey* defense might be sustainable if the other conditions are met. The hearing committee, however, as noted above, found that misappropriation occurred five or six months earlier, in October 1990. Respondent maintained that he was similarly impaired at that time, and in their respective efforts to prove or disprove that claim, considerable evidence was presented by respondent and Bar Counsel. Respondent called four expert witnesses, Bar Counsel called one; respondent also called several lay witnesses. Those witnesses presented the following picture of respondent's mental condition.

Respondent called Dr. Stanton E. Samenow, a clinical psychologist, who first met with respondent on May 5, 1992. Dr. Samenow testified that respondent had been alcohol-dependent, and had used cocaine and alcohol, from 1988 through 1991, with the heaviest drinking and cocaine use occurring in March or April of 1991 and after. Dr. Samenow testified that he had no information concerning the quantity of alcohol respondent was drinking from 1988 through 1990, and he could not say how alcohol might have affected respondent's judgment before 1991.

Dr. Ronald D. Wynne, a clinical psychologist, also called by respondent, described respondent's addiction as being a "mixed chemical dependence," but could not say whether his misconduct was caused either by alcohol or cocaine usage, concluding that "it is probably some combination of the two." Even though Dr. Wynne testified that respondent could be considered by "any prudent professional" an alcoholic at some point between 1988 and 1991, he conceded that the psychological tests performed did not give any indication "in terms of years" of the date respondent's judgment became impaired by alcoholism. Dr. Wynne did not diagnose respondent as suffering from depression. When asked what was the extent of respondent's drinking problem in October of 1990, Dr. Wynne testified:

I think that ... maybe that was the first cracking of the armor. I think at that point, he was in, if you will, the kind of existential crisis that many people who have drunk heavily for years get in.

Dr. Wynne opined that some condition must have been present at that time to affect respondent's judgment. He concluded that, but for the alcohol and cocaine use, respondent would not have misappropriated the estate funds.

Dr. David T. George, a psychiatrist who treated respondent at the Suburban Hospital in November 1991, testified that he diagnosed respondent as suffering from situational depression[4] and alcohol abuse, a condition less serious than alcoholism or alcohol depen-

---

4. The witness testified that this depression was a "reaction to problems in his life."

dence. Dr. George did not detect any withdrawal symptoms, nor did respondent exhibit physiological evidence of alcohol dependence. Finally, Dr. George was unable to fix the date of the onset of respondent's alcohol abuse.

Respondent also called Susan Makepeace, Director of the D.C. Bar's Lawyer Counseling Program who testified that she first saw respondent in April of 1992, concluding that he had a serious alcohol problem at that time. She referred him to the Kolmac Clinic which conducts an intensive, eighteen-month, out-patient program. Respondent, however, completed only three months of that program, claiming that he did not need the treatment.

Among respondent's lay witnesses were personal friends, professional associates, and a former client. Each testified to some changes in respondent's social behavior and some professional lapses between 1989 and 1991. The former client testified that respondent failed to return a May 1990 telephone call and that respondent did not make contact until 1993 when he called to apologize for his conduct. His personal friends participated in an intervention in November of 1991 when they could no longer ignore the changes in his social behavior.

Bar Counsel called Dr. Raymond F. Patterson, a psychiatrist, who testified that he met with respondent three times in April of 1993, and that he reviewed the records of Drs. Samenow and Wynne and those of Suburban Hospital and the Kolmac Clinic. His diagnosis of respondent included indications of alcohol dependence, cocaine abuse, and dysthymic disorder, defined as "depressive symptoms," which was characterized as "essentially a lesser or minor depression." Dr. Patterson testified that the closest point in time he could fix for the onset of actual deterioration in respondent's ability to function due to alcohol was between March and December of 1991. Dr. Patterson also testified that he was unable to say "with professional certainty," whether respondent's judgment was impaired prior to March of 1991, or if it was impaired, the extent of any impairment. He opined that at the time respondent misappropriated his clients' funds (Octo-

ber 1990), he would have been able to form an intent to take money he knew did not belong to him, and would have known that such conduct was wrong.

On the basis of this testimony, and for the reasons discussed below, the hearing committee concluded that respondent had not established that he suffered from alcoholism or depression at the time he misappropriated his clients' funds, an indispensable element of a *Kersey* defense. The hearing committee observed that, even though the medical evidence conclusively established respondent suffered, at some point, from a combination of alcohol abuse or dependence, cocaine abuse, depression, and possibly a personality disorder, these conditions were found to be medically disabling no earlier than March of 1991, and no later than November of that same year when respondent was hospitalized. *See In re Miller,* 553 A.2d 201, 205–06 (D.C. 1989). Therefore, because the misappropriation was found to have occurred in the fall of 1990 and respondent did not begin to suffer from alcoholism or depression until five or six months later, the hearing committee concluded that respondent could not invoke the *Kersey* defense. The hearing committee also found, assuming respondent was impaired by alcohol in late 1990, that he failed to show that the alcohol impairment substantially caused the misconduct or that he had since been rehabilitated. It recommended disbarment. Concurring in that recommendation, the Board agreed with the hearing committee's finding that there was no proof of alcoholism. The Board also found there had been no showing that the misconduct was substantially caused by alcoholism and that respondent failed to establish that he was rehabilitated.

## C. Bias Claims

Three of the four hearing days were devoted to respondent's mitigation defense, and during respondent's mitigation testimony, the lay member of the hearing committee questioned respondent, who is black, concerning his previous assertion that he had been subjected to racial prejudice while associated with an all-white law firm, which, according to respondent, contributed to his drinking

problem. In addition, the same hearing committee member, in a concurring opinion, expressed his personal view that this court has been too lenient in permitting attorneys' alcoholism to serve as mitigation for otherwise disbarrable violations. Respondent contends that the lay member's questions during the hearing and the sentiments he expressed in the concurring opinion demonstrated personal bias.

Respondent also alleges bias on the part of the committee chair because the chair questioned the relevance of the testimony of one of respondent's witnesses. After hearing that witness's testimony, which was both lengthy and marginally relevant, the chair cautioned respondent that the testimony of respondent's remaining witnesses would only be relevant to the mitigation defense if they testified concerning actions that tended to establish that respondent's drinking had an effect upon his behavior. Although not all of the listed witnesses actually testified, the chair did nothing to prevent respondent from calling any of those witnesses; nor did the chair limit the testimony of the witnesses who did testify.

## II.

The issues before this court are: (1) whether the Board's finding that respondent failed to establish that the misappropriation was due to an alcoholism-induced impairment of his ability to conduct his professional responsibilities is sustainable; and (2) whether the Board erred in rejecting respondent's contention that members of the committee were biased against respondent so as to deprive him of a fair hearing.

### A. Misappropriation

■ As stated previously, the Board must accept the hearing committee's factual findings that are supported by substantial evidence in the record, *Micheel, supra,* 610 A.2d at 234, and this court, in turn, must accept the Board's findings of fact, applying the same standard. *See* D.C. Bar R. XI, § 9(g) (1994); *In re Cooper,* 591 A.2d 1292, 1294 (D.C.1991). Respondent contends the misappropriation of estate funds occurred in March 1991, however, the hearing committee found that the misappropriation occurred in the fall of 1990, possibly as early as October of that year.[5] While there is evidence in the record that respondent also misappropriated funds in March 1991, there is substantial evidence, not satisfactorily rebutted, that the misappropriation occurred at the earlier time. *See In re Godfrey,* 583 A.2d 692, 693 (D.C.1990); *In re Thompson,* 579 A.2d 218, 221 (D.C. 1990) (evidence as to time of misappropriation was wholly within respondent's ability to produce and his testimony on this matter is speculative, entitling it to little weight). Therefore, on the basis of the evidence presented, the Board concluded that misappropriation occurred in October of 1990. That finding is firmly supported by the record and we have no basis for concluding that the Board erred in making it.

### B. The *Kersey* Defense

■ We next turn to consideration of respondent's contention that he established entitlement to the benefits of the *Kersey* defense. In analyzing that claim, the Board applied a three-pronged test, requiring respondent to satisfy each prong of the test. Under that test, respondent must: (1) prove by clear and convincing evidence that he suffered from an alcoholism-induced impairment[6] at the time he misappropriated his

---

**5.** Bar Counsel was obligated to establish, by clear and convincing evidence, that a misappropriation occurred at some point after the clients' funds were received. *See In re Williams,* 464 A.2d 115, 119 n. 8 (D.C.1983). Respondent, however, was obligated to show, also by clear and convincing evidence, that he suffered from an alcoholism-induced impairment when the misappropriation occurred, and, by a preponderance of the evidence, that the impairment caused him to commit the acts constituting the misconduct. *See Miller, supra,* 553 A.2d at 203–04;

*Kersey, supra,* 520 A.2d at 327. Thus, if respondent sought to avail himself of a *Kersey* defense relating to his conduct in March 1991, it was his burden to establish that the misappropriation occurred at that time rather than on the earlier date.

**6.** In *Temple* we held that the *Kersey* defense was also available to an attorney who was addicted to lawfully acquired drugs. *In re Temple,* 596 A.2d 585, 586 (D.C.1991).

clients' funds; and if so, (2) prove by a preponderance of the evidence that the alcoholism substantially caused him to engage in that misconduct; and (3) prove by clear and convincing evidence that he now is substantially rehabilitated. *See Temple, supra* note 6, 596 A.2d at 586, 591; *Miller, supra,* 553 A.2d at 203–04; *Kersey, supra,* 520 A.2d at 326–27. Although we have never formally adopted this test, the Board regularly uses it, and we have, without remark, accepted its use, as does respondent in this case.[7] *See In re Appler,* 669 A.2d 731, 739 (D.C.1995). So far as we can determine, the application of this test has never been challenged and we conclude, for the reasons discussed below, that it correctly sets out what needs to be established. Therefore, we hold that in order to invoke a *Kersey* defense, an attorney must meet this three-pronged test.

The Board concluded that respondent failed to satisfy any of the prongs. Because we are satisfied that the Board's finding that respondent failed to satisfy the first prong is sustainable, we hold that respondent's assertion of the *Kersey* defense fails. We, therefore, do not consider the other two prongs.

### 1. Standard of Proof

Before we turn to our analysis of the Board's application of the first prong, we will address a burden of proof issue that divides the majority from our dissenting colleague. As noted, the hearing committee and the Board applied the three-pronged test outlined above, each concluding that respondent failed to meet his burden on each prong. As to the first prong, the Board found that respondent failed to show, by clear and convincing evidence, that he was suffering from an alcoholism-induced impairment in the fall of 1990, when the Board found the misconduct occurred. Although respondent argues in this court that he met his burden on this prong, he does not challenge the Board's use of the clear and convincing evidence standard. In our previous cases, there has been no occasion to address the question of the burden of proof that applies to this prong,

because there was never any dispute that the attorney was impaired by alcohol, or drugs, during the period when the misconduct occurred. *See, e.g., Miller, supra,* 553 A.2d at 204; *Kersey, supra,* 520 A.2d at 325; *Temple, supra,* 596 A.2d at 589. Therefore, in our previous cases, we focused on the burden of proof necessary to establish the nexus between the impairment and the misconduct, *i.e.,* the second prong of the test. With respect to that causal connection, we applied a preponderance of the evidence standard. *Miller, supra,* 553 A.2d at 203–04 n. 4. In this case, however, the extent of respondent's alcoholism in the fall of 1990 was very much in dispute.

To invoke this defense, an attorney must, in the first instance, before the question of causation even arises, show that he or she was impaired by alcohol during the period of the misconduct. *Kersey, supra,* 520 A.2d at 326. Such a showing is one almost entirely within the attorney's capacity to establish, just as, at the other end of the process, it is the attorney who has the wherewithal to show that he or she has been rehabilitated. We think it self-evident that it is the attorney who has the greatest access to the evidence, and who can best identify medical and lay witnesses necessary to show both impairment and rehabilitation. Because of these considerations, and because a successful invocation of this defense often permits an attorney to avoid serious sanctions, including disbarment, for conduct causing great harm to his or her clients, we do not consider a clear and convincing evidence requirement for both the disability prong and the rehabilitation prong to be either unduly burdensome or unreasonable. *See Temple, supra,* 596 A.2d at 591; *Appler, supra* note 7, 669 A.2d at 741 (holding that respondent failed to show, by clear and convincing evidence, that he has been rehabilitated). Although we think that we have implicitly imposed that standard in our previous cases, to eliminate any doubt, we now hold that an attorney must meet the clear and convincing evidence standard on

---

7. In his motion before the hearing committee, in which he sought to invoke the *Kersey* defense, respondent acknowledged the test applied when he stated: "[u]nlike the burden of proof on the

issues of disability and rehabilitation, [respondent's] burden on causation is only by a preponderance of evidence."

both the impairment and rehabilitation prongs of this defense. It is that standard, not challenged by respondent, that the Board applied here.

Our dissenting colleague maintains, however, that by imposing a clear and convincing evidence standard on the first prong we have, in effect, imposed that same standard with respect to the second prong that, as we held in *Miller*, only requires a showing by of a preponderance of the evidence. We do not agree. Each step of this test is separate and distinct, and can be fairly kept so. We clearly recognized that separation in *Kersey*, where we observed: "As the Board aptly noted, '[i]t is not enough to say that the offender is an alcoholic and *ipso facto* causation is proven. After all, not all alcoholic lawyers steal their clients money.'" *Kersey, supra*, 520 A.2d at 325; *accord In re Shorter*, 570 A.2d 760, 770 (D.C.1990) ("If respondent has established that he could not resist, we would be inclined to consider his gambling pathology as a defense, *provided he could also provide a further causal link* between the illness and his sanctionable non-gambling behavior.") (emphasis added). Indeed, in this case, both the Board and the hearing committee had no difficulty maintaining separation between the first and second prongs. Both carefully distinguished each step of the process from the other, drew separate conclusions with respect to each, and found, on the causation prong, that respondent failed to show, by a preponderance of the evidence, that the requisite connection had been established.[8] Although we do not address the Board's finding on causation because our ruling on the first prong is dispositive, we think the Board unmistakably demonstrated that the question of causation is a readily identifiable element of the test that is separate and distinct from the other prongs, carrying its own burden of proof. Therefore, we cannot

agree with the dissent's contention to the contrary.

## 2. Analysis of the First Prong

■ The evidence indisputably supports respondent's claim that he was suffering from alcoholism by November of 1991, and very likely as early as March of 1991. As noted above, however, the misappropriation was found to have occurred late the previous year and respondent had the burden of showing that he was impaired at that time. This respondent failed to do.

The experts from both sides essentially agreed that respondent's ability to conduct his professional activities was impaired by alcoholism by March 1991, but with the possible exception of Dr. Wynne, none opined that such an impairment was present at an earlier time. The hearing committee and the Board did not credit some of the expert testimony because it depended on respondent's self-reporting of facts, reasoning that the facts supplied were of questionable reliability because they may have been influenced by respondent's self-interest.[9] Finally, although the lay witnesses called by respondent did testify regarding some professional lapses in his performance in 1990, the hearing committee gave little weight to that testimony, as it was permitted to do, DISTRICT OF COLUMBIA BOARD OF PROFESSIONAL RESPONSIBILITY RULES Rule 11.2, *Actions by Hearing Committee* (1990) ("BOARD RULES"), because, during that period, respondent's "lapses," apart from the misappropriation, were minimal. The Board agreed. We have no basis, on this record, for overturning these findings or the Board's ultimate conclusion that respondent failed to meet the first prong of the *Kersey* test; *i.e.*, he failed to prove by clear and convincing evidence, that his ability to carry out his professional duties was im-

8. The Board also found that respondent failed to meet the third *Kersey* requirement. While we do not need to address that prong of the test, we emphasize that rehabilitation is crucial. A fundamental underpinning of any *Kersey* treatment is the clear indication that the misconduct will not recur.

9. The hearing committee took this position because of a number of conflicts in respondent's

own testimony. One striking example was respondent's initial testimony that he had placed estate funds in a locked box where they remained, and that he never misappropriated them for his own use. After Bar Counsel established that respondent had later borrowed funds in order to repay the estate, respondent admitted he had in fact used the estate funds for his own use.

paired by alcoholism at the time he misappropriated his clients' funds. It follows therefore that the *Kersey* defense must fail.

## C. Bias

Finally, respondent maintains that the Board erred in rejecting his contention that two members of the hearing committee were biased against him. To prove bias, respondent must present facts: "(1) that are material and are stated with particularity; (2) which, if true, would convince a reasonable person that bias exists; and (3) which show that the bias is personal, as opposed to judicial, in nature." *See In re Alexander,* 466 A.2d 447, 449 (D.C.1983); *In re Evans,* 411 A.2d 984, 994 (D.C.1980). As the Board found, respondent failed to meet these requirements.

### 1. Alleged Bias of the Lay Member of the Hearing Committee

■ As noted above, three of the four hearing days were devoted to the respondent's mitigation defense, and, with respect to the rehabilitation element of that defense, respondent's experience at the all-white law firm where he had been employed was relevant because it was probative on the question of whether respondent could withstand future racial tensions without relapsing into alcoholism. The committee had before it a report submitted by Dr. Patterson, who had been called as an expert witness by Bar Counsel, which reported that respondent had stated to him that he had been subjected to racial prejudice at the law firm. Respondent contradicted that assertion in his own testimony before the hearing committee, however, when he denied that any racial prejudice had been directed at him during that employment. That denial triggered a series of follow-up questions on that point from the committee's lay member.[10] *See* BOARD RULE 11.1 (Rule expressly permits the questioning of a witness by committee members "for the purpose of clarifying matters raised at the hearing."). It is those questions that respondent claims show bias on the part of that hearing committee member.

While at first blush, the questions, when read in the cold transcript, might give one pause concerning the motivation of the questioner, there is no contemporaneous indication that either respondent or his counsel considered that the inquiries by the hearing committee member evidenced a biased viewpoint. For example, none of respondent's

---

10. The substance of the questions asked by the lay member and the answers provided by respondent were as follows:

Q. What is the racial make up of your firm?
A. They are all white....
Q. One of the difficulties of being a very smart young black man like yourself is white folks and how they behave. One of the things that I am worried about is that perhaps you have not yet come to the conclusion of how it is possible to deal with white folks. It seems to me that what happened to you when the firm treated you as they did, it drove you over the line because you felt that you were being treated as if you were nothing because of your color, and that that sense of it was one of the more important motives for what happened to you, in addition to your mother's death, and in addition to your family's falling apart, and in addition to other elements that we can think of. I am not here pushing in particular other than this. I want you to tell me that you have reached the point that you can deal with that. Because if you cannot deal with that, it is going to happen again....
A. ... But I didn't look at it as a race thing.
Q. Except you yourself described that this is what drove you over the line.

A. Oh it was. It was.
Q. There were many alternatives that you still had available to you at that time. Why was this thing so powerful in its destructive effect upon you? I am asking the question straightforwardly because I have had a great deal of experience. As I say, you are a very smart young black man, and many of them end up where you have ended up. Most of them ended up there because they thought they were doing the thing that white folks expected them to do, and they did it very successfully, and then at some point someone pulled the rug out from under them and they went down the tubes.... I have seen it happen many, many times. It is a very familiar kind of situation from my experience. And I want to make sure that you actually are able to handle that, because it is a terribly destructive thing, as you well know.
A. Your question is: Do I believe that because I am black that it did not work out with that firm? And how would I deal with that again?
Q. [yes] ...
A. [That had] nothing to do with color. And I guess color had not been an issue again until you raised it. To me the issue was, I allowed myself to be programmed by failure ... if they were black I would have felt the same way.

answers· suggested any such concern on his part; indeed, as discussed below, the opposite would appear to be the case. Moreover, respondent's experienced counsel, who was present throughout the inquiry, did not object or give any other indication that she found the questions to be in any way improper. In fact no claim of bias was made until respondent filed his exceptions to the hearing committee's report some six months after the testimony was given and one month after the hearing committee issued its unanimous report recommending respondent's disbarment.

Moreover, the Board found, and there is nothing in the record to support a contrary conclusion, that the questions by the hearing committee member did not establish that the member was biased against respondent. Indeed, as the Board observed, a reading of the entire exchange between respondent and the hearing committee member, suggests that the latter seemed somewhat sympathetic to respondent's circumstances rather than hostile. One example provided by the Board was the lay member's comment:

> I am not here pushing anything in particular other than this. I want you to tell me that you have reached the point that you can deal with that. Because if you cannot deal with that, it is going to happen again[,]

which was followed by a lengthy response that reveals no hint of any hostility or irritation by respondent. This was followed by

further exchanges which gave no sign that the questions had sprung from a biased source or that respondent perceived that they did. In sum, as the Board found, respondent did not show that the lay member of the hearing committee was personally biased against him.

Respondent also contends that the same hearing committee member, in his written concurring opinion, displayed a predisposition toward imposing the harshest possible sanction against him.[11] The board rejected this claim as unfounded; we also find that claim meritless.

We think, at most, that the opinion reflects the hearing committee member's firm disagreement with the way the attorney disciplinary system currently deals with the question of attorney impairment, induced by substance abuse, that results in harm being inflicted upon clients. Expression of such an opinion, however, does not itself constitute bias because a hearing committee member may hold an opinion and express his or her views on law or policy without providing ground for reversal if the member still "is capable of refining his views ... and maintaining a completely open mind...." *See* *S.E.C. v. First City Fin. Corp.*, 281 U.S.App. D.C. 410, 417, 890 F.2d 1215, 1222 (1989) (citations omitted). In our jurisprudence, it is not uncommon for judicial officers to criticize the law in concurring and dissenting opinions or in other ways.[12] That practice is

---

11. The concurring opinion of lay member of the hearing committee was as follows:

> I strongly agree with the Committee's recommendation to disbar Respondent, but I go considerably further. I think it obvious that in this case, as in any case in which Respondent claims mitigation for a disbarrable offense because of the disability of addiction, whether alcohol or some other psychoactive drug, *at a minimum*, the Respondent should be immediately suspended from the practice of law until he or she can show, ... the addiction does not constitute a danger to his or her clients.... *At the same time in my five years experience sitting on hearing committees, the claim has too often been an obvious attempt to a scam, whose only purpose is to escape suspension or disbarment. By tying suspension to the claim of disability because of addiction, we can destroy most of its appeal for unscrupulous lawyers ...*
>
> Unfortunately, in the leading cases handed down by the Court of Appeals, notably *Temple,*

*Miller,* and *Kersey,* the weakened standards of causation and proof adopted in them (and the retreat from deterrence as a relevant consideration) has the consistent result of placing the disability of the lawyer before the interest of both the profession and the public.
>
> \* \* \* \*
>
> It is an important responsibility of the Bar to assist addicted lawyers in their rehabilitation. However, the present attitude of the Court of Appeals to that responsibility is that of locking the barn door after the horse has fled.... (Emphasis added).

12. *See, e.g.,* Marvin E. Frankel, *Bench Warrants Upon The Prosecutor's Demand: A View From The Bench,* 71 Colum.L.Rev. 403, 415 n. 42 (1971) ("A draft of this article was distributed before publication to the Advisory Committee on the Federal Rules of Criminal Procedure. At the request of the Committee's Chairman ... [the author] tendered a suggested revision of rule 9(a)

a time-honored means of keeping the law responsive to changing conditions. For example, in *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 349, 112 S.Ct. 2009, 2017–18, 119 L.Ed.2d 121 (1992), *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 373, 112 S.Ct. 2019, 2030–31, 119 L.Ed.2d 139 (1992), and *Philadelphia v. New Jersey,* 437 U.S. 617, 629, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978), over a span of fourteen years, Chief Justice Rehnquist, consistently and "largely for the ... [same] reasons," dissented from the position taken by the majority of the Court. He criticized the majority's application of the Commerce Clause to out-of-state hazardous waste disposal and gave the reasons he thought the application should be different. This expression of his point of view, however, did not establish that he was "biased" against any party.

Similarly, in this case the lay member of the hearing committee did no more than what scores of other judicial officers have done, and his concurring opinion is fully in keeping with that time-honored practice. On this record we can discern no basis for concluding that the Board erred in ruling that the committee member had set aside his "personal views—which, given human nature, are always present—and found the relevant facts solely on the evidence presented." *First City Fin. Corp., supra,* 281 U.S.App. D.C. at 417, 890 F.2d at 1222.

### 2. The Chair

■ Respondent also alleges that the chair was biased because he suggested that one of respondent's witnesses had not added much to respondent's case. This contention borders on the frivolous.

It is evident from this record that the chair merely attempted to ascertain the number of witnesses respondent intended to call, and by way of a proffer of their testimony, to determine whether their testimony would be cumulative or even relevant, and whether stipu-

lations might be a more efficient way to present the evidence. The chair made this inquiry after three witnesses, from a list of over a dozen prospective mitigation witnesses, had testified. Such an inquiry, rather than indicating bias or prejudice, was nothing more than the reasonable exercise of the presiding officer's prerogative to properly conduct the proceedings. *See* BOARD RULE 11.2 ("Hearing Committee shall determine the weight and significance [of the] ... evidence," and may exclude irrelevant and cumulative evidence.); *see also Williams v. United States,* 228 A.2d 846, 848 (D.C.1967) ("[chair] has responsibility of moving a [hearing] along in an orderly and efficient manner; in short he has the responsibility of managing the conduct of a [hearing]"); *Molnar v. Gulfcoast Transit Co.,* 371 F.2d 639, 640 (5th Cir.1967) (the need to preserve limited judicial resources puts burden on judge to give procedural direction to a case to assure the most effective use of resources consistent with interests of justice). There is no support whatsoever in this record that the chair's actions in any way denied respondent a fair and full opportunity to present his case to the committee.

Therefore, it is ORDERED that respondent, Clarence F. Stanback, Jr., shall be disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion.

WAGNER, *Chief Judge,* dissenting:

Respondent, Clarence Stanback, a previously exemplary lawyer according to the evidence of record, admitted committing the serious disciplinary violations involved here. The hearing committee found that the medical evidence conclusively established that Stanback suffered from alcohol abuse and depression, the conditions to which he attributed his aberrant behavior and sought to prove in mitigation of sanction. *See In re Kersey,* 520 A.2d 321, 326 (D.C.1987). The

that would substantially embody the views here espoused."); Ruth Bader Ginsburg, *A Plea For Legislative Review* 60 S.CAL.L.REV. 995, 995 (1987) (citing Congress' failure to review and revise statutes that "slip from the judges' grasp" as one cause for federal court overload).

At the time of these publications, Judge Frankel was a United States District Judge for the Southern District of New York, and Justice Ginsburg was United States Circuit Judge, D.C. Circuit; she is now an Associate Justice of the United States Supreme Court.

hearing committee also determined that Stanback met his burden of establishing both his disabling condition and causation as to all violations occurring "in or after March, 1991."[1] *See In re Miller,* 553 A.2d 201, 203 (D.C.1989). Consistent with the determination of the hearing committee and the recommendation of the Board on Professional Responsibility (Board), this court rejects Stanback's mitigation claim, concluding that he failed to prove by clear and convincing evidence that his disabling condition also existed during the five months immediately preceding March 1991.[2] However, the undisputed evidence, expert and otherwise, establishes that Stanback's disability did not appear suddenly in March 1991, but as is typical of such conditions, evolved over a significant period of time, including the five-month period pivotal to his mitigation claim. The record shows that the factfinder made no credibility determinations against Stanback and the other witnesses concerning the nature and duration of his disability; therefore, its rejection of his mitigation evidence during the critical period is not explicable on that basis. A review of the record will show that Stanback met the burden of proof to which he was held at the time of the proceedings before the Board, *i.e.,* that his disabling condition " 'substantially affected' the charged misconduct by a preponderance of the evidence." *Miller,* 553 A.2d at 203. Whether tested against that standard or the clear and convincing evidence standard, which the court adopts today, the record demonstrates that Stanback established his disability and its connection with his miscon-

duct. For these reasons and those which follow, I respectfully dissent from the opinion of the court.

### *Respondent's Evidence of Disability*

Respondent presented a compelling case in support of his mitigation defense. As the majority points out, the experts for both sides agreed "that respondent's ability to conduct his professional activities was impaired by alcoholism by March 1991." What the majority finds lacking, applying a clear and convincing evidence burden, is evidence of alcohol impairment at the earlier dates covering some of respondent's violations of the disciplinary rules, specifically commencing from October 1990. Even applying the higher burden, however, the expert and lay witnesses, as well as the other evidence, make apparent that respondent's alcoholism did not appear suddenly as a condition in March of 1991, but rather developed, as is the course of such conditions, over a significant period of time.

It should be noted at the outset that the hearing committee did not discredit the testimony of Stanback or any of the other seven witnesses who appeared on his behalf as to the nature and duration of his alcoholism and depression. The majority is mistaken in stating otherwise. *See ante* at 1116–1117. What the hearing committee rejected as warranting no weight was Stanback's *admitted speculation* about when he misappropriated the funds. The hearing committee noted that Stanback "failed to introduce any evidence to show *when* he misappropriated the

---

1. The Report and Recommendation of the hearing committee reads in this connection as follows:

   The Committee concluded that Respondent was disabled only at the time of any violations occurring in or after March, 1991. As to any such charges, therefore, Respondent would be entitled to mitigation of sanctions if he could also demonstrate causation and rehabilitation.
   * * * *
   Because the weight of the evidence leads the Committee to find that the misappropriation of client funds occurred in or about October, 1990, he has failed to meet his burden as to causation on this charge. Similarly, there is no specific evidence of causation as to all other violations found to have occurred through the end of February, 1991. As to all misconduct occurring in or after March, 1991, the Com-

mittee concluded that Respondent has met his burden on the issue of causation.

2. The hearing committee found that each of the violations, with one exception, occurred both before and after March 1991, but no earlier than October 1990. The exception involved conduct related to the violation of Rule 8.4(d) (interference with administration of justice), which occurred only after March 1991. As to the most serious charges, violations of DR 9–103(A)(2) and Rule 1.15(a) (intentional misappropriation), the hearing committee found that Stanback failed to prove that "at the time of his misconduct in 1990, or in January–February, 1991, he was disabled by either alcohol dependence or depression."

funds" and, that he "merely speculated that the misappropriation occurred in March, 1991." It was only on the issue of the timing of the misappropriation that the hearing committee accepted, as more reliable than Stanback's admitted speculation, documentary evidence. It made no such finding as to the duration of Stanback's disability. On the contrary, in concluding that Stanback's condition "probably became disabling in March, 1991," the hearing committee accepted the medical evidence, recognizing that much of it is based on "self-reporting." The record reflects that the hearing committee made no credibility determinations against Stanback, the four doctors, two judges, and the other witness who testified concerning his condition. The question is whether the hearing committee's finding as to the date of the disability "is supported by substantial evidence in the record, viewed as a whole." See In re Micheel, 610 A.2d 231, 234 (D.C.1992) (citation omitted). Stanback argues, and an examination of the record will reveal, that it is not.

Dr. Ronald Wynne, an expert witness, provided the following testimony pertinent to the point: [3]

Basically, during his drinking and drugging years, which were roughly '87 to '91, Mr. Stanback clearly warranted a diagnosis of alcohol and probably cocaine dependence. That the combination of personality factors and stress factors sort of seemed to trigger off that excessive drinking. That there had been at least one period earlier in his life when he had had a similar kind of response to some stressors in his life. That he was certainly seriously disabled during that period of time ....

He was alcohol and probably cocaine dependent for a period of probably four-plus years. And there was a period of probably a couple of years in the middle of that which seems to be when the events for which he was referred to the Bar took place, in which his alcohol and cocaine ingestion was such that, you know, he would be considered I think by any pru-

dent professional to have been an alcoholic at that time ....

So from the test data, from the information that he gave me, from the information that Suburban Hospital, Kolmac, and [Dr. Stanton] Samenow, all of which were consistent, I concluded that he was ingesting large amounts of alcohol at that time. And it had very serious consequences for his life.

Anybody drinking that much would have similar kinds of experiences.

Dr. Samenow also provided testimony bearing upon the issue of causation. He testified in pertinent part as follows:

Q: Dr. Samenow, do you have an opinion whether there was any relationship between Mr. Stanback's alcohol usage and the ethical violations?

A: I do have such an opinion.

Q: And what is that?

A: My opinion is that there is a relationship because, as I indicated earlier, with the increasingly heavy drinking that he reported to me, and we are talking a lot of drinking.... But the intense use of alcohol and then later the cocaine, this was '88, '89, '90, reaching its heaviest in '91.

Indeed, all the experts testified that Stanback was on a downward spiral beginning in the mid 1980's. During cross examination, Dr. Wynne explained what that downward spiral actually meant:

Q: Is there any indication in the Suburban records where he indicates heavily drinking in '88, '89?

A: Well, you don't do an intervention when you call in friends and a professional because somebody has just been drinking for a month. I think that what motivated his wife was that the drinking, which probably had been out of hand for a good while, really got out of hand.

Q: The intervention occurred at the end of 1991?

A: October '91.

---

**3.** Dr. Wynne had conducted over 3,000 evaluations of people who were substance dependent, over 300 evaluations of people who were sub-

stance abusers, had treated over 500 cocaine addicts, and between 150 and 200 alcohol addicts.

Q: October '91. Could his drinking have been out of hand, heavily out of hand, heavily drinking, drinking every night, using cocaine, for the previous six months?

A: Sure.

Q: And he could have been in the condition of October of '91 whether he had been drinking heavily for the last six months or the last four years?

A: I hear you, but I don't understand what you're asking.

Q: You said they would not have done an intervention in October '91 if he had only been drinking heavily for a month previous?

A: Yes.

Q: Could you have done an intervention in October '91 and seen a man in the condition he was in October '91 if he had been drinking heavily for the last six months?

A: Probably not.

Q: What if he had been drinking heavily for the last eight months?

A: I guess in my own—sort of theoretically, yes, *I've never seen anybody who has had that short a period of time for whom someone has done an intervention. Usually these are patterns that go on for a number of years.* There are people around him for whatever reason ignoring or kind of noticing it and kind of making excuses for the person. And finally something gets to a point, something is different for all kinds of people where they can no longer deny what they are seeing. The wife no longer can deny that, you know, there is a problem here.

In addition, Dr. George Kolodner, the medical director of the Kolmac Clinic where Stanback received treatment, listed the following "significant findings" on Stanback's

release form on July 8, 1992, which was an exhibit at the hearing:

The patient had a *5 year history of pathological use of alcohol.* Manifestations of this included:

1. Reduced internal control over use
2. Abnormally high tolerance
3. Considerable time spent in use-related activities
4. Continued use despite adverse consequences (threatened with disbarment from the BAR)

The initial assessment was that the patient had a significant problem with alcohol, for which intensive treatment was indicated. The admitting diagnosis was Alcohol Dependence.

The facts underlying respondent's violations of the disciplinary rules unquestionably cover a period from October 1990 through the fall of 1991.[4] The testimony of the experts, some of which is above-described, as well as that of the lay witnesses, support respondent's claim that he suffered from alcoholism during the relevant period. In addition to medical evidence of his alcoholism, respondent also presented evidence that his behavior during the period of his misconduct represented a radical departure from his prior behavior. We have recognized the significance of such evidence in determining whether alcoholism substantially affected a lawyer's professional conduct. *Miller, supra,* 553 A.2d at 204.[5]

According to evidence stipulated to at the hearing, George Varoutses, a Virginia attorney, knew respondent through participation in the Arlington County Bar Association where both were past presidents. Varoutses had been impressed "with Stanback's lawyering skills" prior to the period associated with his disciplinary violations. However, Varoutses noticed that from about 1990 until March of 1992, respondent seemed to be

---

4. The case proceeded on charges of violations of disciplinary rules in effect prior to January 1, 1991, and those in effect thereafter. The most serious of these violations included misappropriation in or about October 1990 as well as in January, February and March of 1991.

5. In *Miller,* in assessing the attorney's claim of mitigation, we noted:

Here, recognizing alcoholism's "severe effect on human behavior and psychology," along with the record evidence of Miller's behavior (so foreign to that of her previous history of behavior), we would be blinking at reality to conclude that alcoholism did not "substantially affect" her professional conduct.
553 A.2d at 204.

preoccupied, unhappy, and stopped attending bar functions. Not until March 1992 did Varoutses observe that Stanback "appeared to have made a complete behavioral turn around" and "became as involved and supportive of Bar Activities as he had been in the early years." [6]

John Boyd, a friend of Stanback's for some twenty years, testified that from the period of October 1990 to December 1990, he noticed significant changes in Stanback's behavior which led him to confront Stanback in December of 1990. Specifically, Boyd had observed an adverse change in the manner with which Stanback handled his practice. With respect to Stanback's drinking habits during that period, Boyd testified as follows:

Q: Now, in that period of time, specifically, as best you can recall, what was he drinking? What kinds of drinks? *We are talking about between approximately October and December of 1990.*

A: Jack Daniels and ginger ale would be—and then brandy. Jack Hennesy and ginger ale. To me those drinks don't mix. If I drink—when I was drinking Jack Daniels, I drank Jack Daniels and water, Hennesy straight up, you know, but he always had to have something mixed with it. That is why I made the comment that he did not like the taste of liquor.

Q: *Is this at a period when he was doing a lot of drinking?*

A: *Yes.*

\* \* \* \* \* \*

Q: I understand you to have suggested during this period of time when you sat down and talked to him, or when you confronted him, at that point in time you had begun to believe that he might have an alcohol problem. Is that right—and I am not suggesting by asking this question that you are an expert in this, but I am just interested in you telling us what it is that

made you believe, as clearly as you can, that he was having a problem with alcohol.

A: Okay. The reason I was coming—I came to that conclusion was because his whole behavior changed, was drastically different than what it had been in the past, and I was looking for reasons, and I think I always knew the reason, but I denied it, you know. I was in denial that he had a problem.

Boyd testified that his friendship with Stanback dissipated after the confrontation, but they have rekindled it since Stanback has been in recovery.

Judge William Newman, who went to law school with Stanback and shared office space with him from 1980–1988, described Stanback as one of the "brightest and most hard working lawyers he knew." He was "impressed" with Stanback's ability to "juggle many responsibilities at the same time and consistently perform each thoroughly and well." Judge Newman noted that Stanback had an active practice "and court appearance schedule for which he was always prepared and on time." Judge Newman also stated that Stanback was active in the local and state bar associations.[7]

Judge Bruce Lee, who had known Stanback as a professional colleague and friend, described him as "a very effective lawyer who was prepared and who presented himself in court effectively on behalf of his clients." He further testified that in 1990 some friends made him aware that Stanback was missing court appearances and was not returning phone calls. He thought this was very unusual because "normally, if you called him, he would call you back." Out of concern and a desire to discuss with Stanback the changes in his behavior, Judge Lee contacted him, and they agreed to meet; however, Stanback did not keep the appointment. Subsequently, they arranged to meet on October 28, 1990. Judge Lee expressed his

6. Rose Jackson, Stanback's secretary of five years, also provided insight into his earlier professional conduct. She described respondent as detail-oriented, cordial, and "extremely involved in all aspects of the practice."

7. Judge Newman also stated that Stanback, who previously had managed his responsibilities thoroughly and well, became difficult to reach during the winter of 1991. He also recounted an embarrassing incident during that time where Stanback consumed rapidly a large quantity of alcohol and behaved in a way that he had never seen before.

concerns to Stanback, and the two attempted to come up with ideas to help Stanback get things under control. Thereafter, they made several appointments with each other, but Stanback did not keep them. Judge Lee also testified that Stanback, who had been elected to a new position with the local bar, started to miss meetings almost immediately. His absence was so noticeable that some of the members asked Lee to discuss the possibility of resignation with Stanback. Finally, Judge Lee, who participated in the intervention to have Stanback address his alcoholism, testified that, while he had never been with Stanback when he was drinking, he believed the changes in Stanback were related to the drinking because of what Stanback told him and his personal experiences with Stanback's change in personality.

The foregoing examples of the other evidence presented at the hearing supports Stanback's claim that his alcoholism and depression did not commence suddenly in March 1991, but occurred over time during a period which includes the earliest dates of the disciplinary violations in this case.[8] Moreover, there was no evidence that Stanback was not an alcoholic in the fall of 1990 and thereafter. The factfinder should not reject arbitrarily the uncontradicted testimony of an expert or lay witness absent a basis in the record for doing so. *Pansing v. United States,* 669 A.2d 1297, 1302 (D.C.1995) (citing *Prost v. Greene,* 652 A.2d 621, 629 (D.C.1995) and *Rock Creek Plaza–Woodner Ltd. v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983)). The evidence, expert and otherwise, established that Stanback was suffering from alcoholism at the relevant time. Respondent clearly proved these facts even under the "clear and convincing" standard. On this record, the findings and conclusion of the hearing committee which the Board accepted, that there was no proof that Stanback suffered from alcoholism between October 1990 and March 1, 1991, the time of the misconduct, is not supported by substantial

evidence in the record, and this court should reject them. *See In re Cooper,* 591 A.2d 1292, 1294 (D.C.1991) (citations omitted).

### Causation

Bar Counsel argues that even if respondent has proven his disability as of the relevant time period, he failed to prove by a preponderance of the evidence that the misappropriation was substantially affected by his disability. On the contrary, the evidence clearly met that burden. Dr. Samenow testified that respondent's misconduct was related to his alcoholism. Dr. Wynne testified that respondent was seriously disabled at the relevant period and that it had serious consequences for his life. He also testified that it was his opinion that Stanback would not have misused his client's funds absent his substance abuse. Even the expert witness called by Bar Counsel, Dr. Patterson, testified that respondent's behavior was substantially affected by his disability. Dr. Patterson could not state the proposition in terms of a "but for" cause; however, when the question was framed in terms of whether the disability substantially affected respondent's misconduct, an inquiry consistent with our opinions, the witness answered affirmatively. Respondent has shown a sufficient nexus between his misconduct and his alcoholism to meet his burden under *Kersey, supra,* 520 A.2d at 326–27; *see also Cooper, supra,* 591 A.2d at 1296; *Miller, supra,* 553 A.2d at 203. In light of the majority's disposition of the case, I need not address the issue of respondent's rehabilitation. *See In re Temple,* 596 A.2d 585, 591 (D.C.1991) (rehabilitation from disabling substance abuse is a significant factor in determining discipline).[9]

### Burden of Proof

Our case precedents hold that "where an attorney claims alcoholism as a mitigating circumstance in a disciplinary proceeding,

---

8. Stanback's depression was diagnosed by Dr. David George who described it as "situational adjustment reaction with depressed mood." The majority points out that situational depression is a lesser form than clinical depression. In this case, however, Dr. George treated Stanback with the anti-depressant drug, Prozak.

9. In light of my opinion that Stanback adequately established alcoholism as a mitigating factor, I would not reach his bias claim.

the attorney has the burden of proof on that issue and the attorney must show that alcoholism 'substantially affected' the charged misconduct *by a preponderance of the evidence.*" *Miller, supra,* 553 A.2d at 203 (emphasis added); *accord, Temple, supra,* 596 A.2d at 591. Today, the majority adopts a "three-pronged test" for establishing a *Kersey*[10] defense which elevates the burden of proof on issues pertinent to the establishment of that defense to one of clear and convincing evidence.[11] In *Miller, supra,* this court considered and rejected specifically the higher burden of proof for this type of mitigation defense. Recognizing that there were other courts which had adopted a greater *burden of proof* and that the Board also adopted the higher standard in its Report and Recommendation in *Kersey, supra,* we rejected this standard. We then stated that

> [n]otwithstanding this, we believe that the preponderance of evidence standard is the more appropriate standard. As this court recognized in *Kersey,* difficult problems of proof are presented here. Given our view that the purpose of discipline in cases involving alcoholism should be to rehabilitate not punish, we think the lower standard is more appropriate.

*Miller, supra,* 553 A.2d at 203–04 n. 4; *see also Kersey, supra,* 520 A.2d at 326. While the majority restricts the "clear and convincing" evidence burden to proof that the attorney "suffered from an alcoholism-induced impairment at the time [of the misconduct]," that issue is central to proof of the requisite close nexus between the attorney's misconduct and the alleged disability. *See Temple, supra,* 596 A.2d at 590. Therefore, the majority's holding places upon the attorney the burden of proving that nexus by clear and convincing evidence contrary to our prior holdings. Proving the precise date of the onset of alcoholism and depression present the type of difficulties of proof which formed the basis for our rejecting the higher burden of proof in *Miller,* 553 A.2d at 203–04 n. 4. Although proof by clear and convincing evidence is a greater burden than our case law required him to meet when he presented his

case, the record demonstrates that Stanback met this burden and established that he suffered from a disabling condition and that his professional conduct was substantially affected by it. *See Kersey,* 520 A.2d at 326. Therefore, I respectfully dissent.

---

10. *See Kersey, supra,* 520 A.2d at 326–27.

11. See majority opinion at 1115–1116.